Félix Agosto, demandante y apelado, *v.* Porto Rican Express Co., demandada y apelante.

No. 5925.—*Sometido:* Noviembre 7, 1934. *Resuelto:* Enero 17, 1935.

*Juan B. Soto,* abogado de la apelante; *Arturo Aponte,* abogado del apelado.

El Juez Asociado Señor Aldrey, emitió la opinión del tribunal.

La corporación privada Porto Rican Express Company interpuso esta apelación contra la sentencia que la condena a pagar determinada cantidad de dinero al demandante Félix Agosto como indemnización por la muerte de su hijo Esteban Agosto ocurrida el 25 de octubre de 1927 cuando tenía 17 años de edad, como consecuencia de un golpe que recibió en un choque ocurrido entre él y un autocamión de carga que la apelante tenía empleado en su negocio.

Uno de los motivos alegados por la corporación apelante para este recurso es que la corte inferior cometió error en la apreciación de la prueba al concluir que no existía un contrato válido de transacción entre las partes de este pleito con respecto a la acción ejercitada por el demandante; cuestión que pasaremos a estudiar y resolver desde luego porque si tal transacción se probó, entonces, será innecesario

resolver si ese accidente ocurrió por culpa o negligencia de los empleados de la apelante, ya que la transacción es un contrato que según el artículo 1717 del Código Civil tiene para las partes la autoridad de la cosa juzgada.

El juicio en este pleito tuvo lugar en la Corte de Distrito de Humacao en enero de 1931.

Esteban Agosto era hijo de Félix Agosto y de su esposa Sabina Valentín con quienes vivía en el pueblo de Ceiba, donde ocurrió el accidente que motivó este pleito y su muerte.

Ramón Arias, que vive en San Juan y es empleado de la sociedad Maryland Casualty Company, aseguradora contra accidentes del autocamión de la demandada, declaró en el juicio que él estuvo en el pueblo de Ceiba el 26 de octubre de 1927 e hizo una investigación del accidente ocurrido a Esteban Agosto y que por la tarde fué al cementerio donde lo enterraban y allí habló con Félix Agosto a quien expresó su pena por la muerte de su hijo y le manifestó que cuando lo creyera conveniente fuera a su oficina en San Juan para tratar de una transacción amistosa, lo que hizo porque es la política de su compañía transar si es posible aunque no tenga responsabilidad; que esa conversación fué en presencia de un hermano de Félix Agosto, al cual dijo que hicieran un arreglo amistoso con la compañía; que el 2 de noviembre siguiente, siete días después, se presentó en su oficina de San Juan Félix Agosto con Cristino Meléndez y con Luis Ramos; que a los dos últimos no los conocía antes de ese momento; que le manifestaron que iban para tratar el asunto del hijo de Félix Agosto; que éste y Luis Ramos que hacía las veces de su abogado pidieron $1,000 en transacción pero después de varias proposiciones mutuas llegaron a un acuerdo por $650 y fué redactado un documento con su copia en el cual Félix Agosto en consideración a esa cantidad exoneraba y liberaba a la demandada de toda responsabilidad por la muerte de su hijo Esteban, documento y copia en el que Félix Agosto puso una cruz por no saber firmar y que Cristino Meléndez firmó como testigo; que cuando iba a firmar tam-

bién Luis Ramos como testigo pensó el declarante que esa exoneración debía firmarla también la esposa de Félix Agosto y se lo dijo a ellos, así como que estaba dispuesto a acompañarlos a Ceiba para recoger esa firma; que fué hecho otro documento de igual clase con su copia para ser firmado por los dos esposos; que con tal objeto salieron los cuatro a las cinco de la tarde para Ceiba a donde llegaron a las siete de la noche; que en el camino dijo el testigo a Félix Agosto que explicara a su esposa la transacción que había hecho; que al llegar a Ceiba entraron los cuatro en la casa donde estaba la esposa de Félix con otras personas; que Félix Agosto dijo a su consorte Sabina Valentín la transacción que había celebrado con la compañía por $650, a lo que ella contestó que lo que él hiciera estaba bien hecho, y puso una cruz en el documento y en su copia, retirándose después los cuatro a la casa de Cristino Meléndez donde Félix Agosto hizo una cruz en el documento y en la copia que había suscrito su cónyuge y firmaron Cristino Meléndez y Luis Ramos como testigos; que les leyó ese documento de exoneración de responsabilidad y entregó a Félix Agosto un cheque por $650 de la compañía aseguradora extendido a nombre de los dos consortes, y dijo al demandante la manera cómo debían endosarlo, poniéndole al dorso del cheque lo que debía decir el endoso; y que después del día en que enterraron a Esteban Agosto no volvió a Ceiba hasta el 2 de noviembre por la noche con los tres que habían ido a San Juan.

En los autos se halla un documento con su copia en el que solamente Félix Agosto, en consideración a la cantidad de $650, exonera de responsabilidad a la demandada por la muerte de su hijo Esteban, estando el original y la copia con una cruz entre las palabras "Félix Agosto", y teniendo una firma que dice "Cristino Meléndez." También hay otro documento con su copia por el cual Félix Agosto y Sabina Valentín exoneran de responsabilidad a la demandada por el expresado accidente, cuyo documento aparece con una cruz entre las palabras "Félix Agosto" y con otra entre las

palabras "Sabina Valentín", y tiene las firmas que dicen "Cristino Meléndez"—"Luis Ramos". Esos documentos y sus copias están impresos, con espacios llenos con maquinilla, siendo el texto en español y en inglés, apareciendo el idioma español preferentemente en el impreso con letras mayores que las del inglés, y los huecos llenados con maquinilla en español solamente. También se presentó un cheque por la cantidad de $650, en papel amarillo, extendido a la orden de Félix Agosto y de Sabina Valentín.

La prueba del demandante en lo relativo a la transacción consistió en su declaración, en la de su hermano Gil y en la de Cristino Meléndez.

Gil Agosto declaró respecto a la conversación que él y el hermano Félix tuvieron en el cementerio con Arias, quienes les dijo que el Express estaba asegurado y que había una indemnización; que Arias les dió su nombre para que fueran a San Juan y les dijo que no le dieran el caso a abogado porque el dinero pertenecía a la familia cuando fueran a hacer transacción; que cuando les habló en ese sentido fué de transacción en dinero; y que después de ese día vió pasar a Arias a cada rato en automóvil por allí.

Cristino Meléndez y el demandante viven en Ceiba, estuvieron con Luis Ramos en la oficina de Arias en San Juan el día 2 de noviembre y los tres regresaron con Arias a Ceiba en automóvil, llegando a la casa del demandante a las siete de la noche y los cuatro entraron en la sala de la casa donde estaba Sabina Valentín, esposa de Félix Agosto, con otras personas.

Con respecto a la transacción declaró Cristino Meléndez que fué a San Juan con Luis Ramos y Félix Agosto porque él le dijo que deseaba que fueran allá porque lo habían ido a buscar dos o tres veces para tomarle declaración. Después de esa manifestación ocurrieron las siguientes preguntas y respuestas de Cristino: "P.—¿Y si usted no tenía interés alguno en este asunto, por qué hizo usted un viaje a San Juan en unión de Félix Agosto, y después vino usted a la

Ceiba y firmó esos documentos? R.—Él me dijo cuando yo salí para San Juan ese día que fuera yo allá con él para que le enseñara el número de la casa, y yo le dije que no sabía bien, pero que Luis Ramos sabía leer y andábamos juntos y me dijo: 'Vamos que yo les voy a enseñar.' P.—¿Usted no sabe leer? R.—No, señor. P.—¿Y usted fué con Félix Agosto como experto y usted no sabe leer? R.—Fué Luis Ramos. Yo estaba en San Juan, pero él me dijo que fuera allá y yo le dije que no sabía bien y entonces Luis Ramos fué con nosotros." Más tarde, a preguntas del abogado del demandante, dijo que tenía una tienda y al preguntarle qué pasó en la tienda contestó: "R.—Pues estaba Luis Ramos, que había llegado de paseo en casa, y por allí era que andaba este señor investigando. P.—¿El Sr. Arias? R.—Sí, señor, que le conozco de vista; así que hablaron entonces él habló con Luis Ramos y Luis Ramos habló conmigo.—Hon Juez: Hable más fuerte, no lo oigo.—Testigo: Me habló entonces él para que fuera allá a San Juan.—Hon. Juez: ¿Quién habló? R.—El Sr. Arias.—Lic. Aponte: ¿Este señor habló con Luis Ramos y con usted? R.—Sí, señor. P.—¿Félix Agosto había hablado con usted sobre eso? R.—No, señor. P.—¿Todavía no había hablado Félix Agosto con usted y ya el Sr. Arias estaba hablando con usted y con Luis Ramos en la tienda de usted? R.—Sí, señor. P.—¿Cuál era el propósito de Arias al hablar con usted y con Luis Ramos? R.—Que le lleváramos a Félix Agosto allá. P.—¿Que le llevaran a Félix Agosto dónde? R.—A San Juan. P.—¿A dónde tenían que llevarlo a San Juan? R.—Dejó la dirección aquella tarde, a la calle de la Tanca, me parece, número cuatro. P.—Es decir, que la primera conversación que tuvo usted de ese asunto fué precisamente por la visita del Sr. Arias a la tienda suya? R.—Sí, señor. P.—¿Y Luis Ramos, a qué se dedica? R.—Pues él estaba allí entonces colocado en la Colecturía de llevar unos paquetes y siempre estaba andando para allá y para acá. P.—¿Con motivo de lo que le dijo el Sr. Arias a usted y a Ramos, qué hicieron ustedes con Félix

Agosto? ¿Quién habló con Félix Agosto entonces de ustedes?
R.—Luis Ramos. P.—¿Y qué hicieron ustedes con Félix
Agosto? R.—Pues que al otro día le dijo Luis Ramos. . . .
P.—¿Después de la conversación con Arias que usted habló
con Luis Ramos, qué hicieron usted y Luis Ramos con Agosto?
R.—Estuvimos en la casa de él. P.—Estuvimos. . . ¿quiénes
son nosotros? R.—Luis Ramos y Cristino Meléndez. P.—
¿Qué le dijeron ustedes a Félix Agosto cuando fueron usted
y Luis Ramos donde él? R.—Que fuéramos allá a San Juan
que Luis Ramos sabía mejor la casa donde era. P.—¿Por qué
Luis Ramos sabía mejor la casa donde era? R.—Porque
había ido más antes. P.—¿Cómo sabe usted que había ido
más antes Luis Ramos? Lic. Iriarte: Eso es información.
El testigo no debe declarar por referencia, que venga Luis
Ramos y lo diga. Lic. Aponte: Sí, Luis Ramos está aquí.''
Con respecto a lo ocurrido en San Juan y por la noche en
Ceiba, ese testigo dijo que no recordaba haber firmado algo
en San Juan, pero cuando se le mostró una firma que dice
Cristino Meléndez manifestó que era suya, que allí firmó dos
papeles. Cuando se le preguntó si después volvió a firmar
otra vez contestó que no recordaba bien si esa firma la dió
allá o cuando vinieron por la noche: que firmó dos veces y
que no recordaba si son las únicas que dió ni si ha dado otras
firmas. Sobre este extremo copiamos lo siguiente: ''P.—
¿Usted recuerda si firmó allá o acá solamente? R.—Yo no
recuerdo si firmé allá o firmé acá; a mí me parece que fué
acá. Abogado: Mire a ver si conoce este documento. . . .
P.—Mire esa firma, esta que dice aquí Cristino Meléndez,
¿es de usted? R.—Sí, señor. P.—¿Es de usted esa firma?
R.—Sí, señor. P.—¿Usted no se acuerda si fué puesta esa
firma por usted en la Ceiba o en San Juan? R.—Yo no me
recuerdo, como son tantos papeles. P.—Son cuatro papeles,
son cuatro firmas las que usted ha reconocido. R.—Bueno,
aquí hay dos. P.—Pero ha reconocido éstas también, la suya,
la que dice Cristino Meléndez es la que yo le digo que usted
identifique. R.—Sí, es mía. P.—¿Suya? R.—Sí, señor.

P.—¿Usted no recuerda dónde la puso, si fué en la Ceiba o en San Juan? R.—No, señor.'' De lo que ocurrió en San Juan manifestó este testigo que Arias dijo a Félix Agosto que había mandado a hacer una investigación para que tuviera derecho en todo tiempo; que allí no se hizo investigación, que la tomaron cuando llegaron a Ceiba por la noche; que al llegar a Ceiba a la casa de Félix preguntó Arias a la esposa de aquél su nombre, su edad, por la de su hijo y si estaba en la escuela, y entonces le tomó declaración a Félix sobre todo lo que había pasado y Arias sacó una libreta y dijo a Sabina que firmara allí y como dijo no saber firmar ella hizo dos cruces; que después de eso se fueron los cuatro a la casa del testigo y allí firmó él y Luis Ramos, después de lo cual Arias entregó un papel amarillo a Félix Agosto; que en su presencia no se habló de transacción sino de investigación. Después de decir que sólo había firmado dos veces contestó a una pregunta que las cuatro firmas son suyas y que vió cuando Sabina y Félix hicieron las cruces en un documento; que en un documento hay dos firmas suyas y en otro hay otras dos de él. Con respecto a lo que ocurrió en la casa de Félix Agosto cuando llegaron allí los cuatro existen las siguientes preguntas y respuestas: ''P.—¿Y dice usted que estaban en el velorio en casa de Félix Agosto, rezando? R.—En la novena rezando. P.—¿Y ustedes llegaron en el momento de la novena? R.—Sí, señor. P.—Terminó la novena o no se terminó? R.—Cuando nosotros salimos no se había terminado. P.—¿Entonces se terminó la novena cuando ustedes llegaron o no habían terminado? R.—Ellos estaban reunidos y no sé si estaban rezando o no estaban rezando. P.—¿Me parece haberle oído decir a usted que estaban rezando? R.—Ellos estaban rezando todos. P.—Al llegar que estaban reunidos y no estaban rezando, entonces esas manifestaciones que hubo allí fué a la vista de todos? R.—Sí, señor.''

Félix Agosto, el demandante, declaró que conoce a Ramón Arias por haberlo visto cinco o seis veces, habiendo sido la

primera en el cementerio donde Arias le habló y también a otra persona; que la segunda vez fué cuando el testigo estaba trabajando y al pasar Arias se detuvo y le dijo que iba a buscarlo porque quería que fuera a San Juan para hacer una investigación del caso y coger unas declaraciones porque el caso era muy importante, que era de seguro y a él le tocaba arreglarlo. Después de eso ocurrió el siguiente interrogatorio hecho por su abogado: "¿Y después, cuándo lo volvió usted a ver? R.—Después no lo ví más a él; después encontré a otro individuo. . . P.—¿Cómo se llama ese individuo? R.—Pues llegó. . . P.—¿Uno que es medio picapleitos? R.—Señor, un hombre que demostró ser un caballero. P.—¿Cómo se llama? R.—Se llama don Luis, don Luis Mora, me parece que se llama. P.—¿Y a qué vino don Luis Mora donde usted? R.—Pues él vino a casa y parece ser que vino investigando el caso, lo que me pasaba a mí, lo que había sucedido. Y yo como no pensaba nada todavía no hacía caso de eso, porque todavía no estaba ni en mi conocimiento. Bueno, y me dijo: 'Precisamente casi yo vengo como que estoy comisionado para llevarte a San Juan para que la casa te vea y bueno es que vayas allá porque me dicen que quieren hacer una investigación contigo, tomar una declaración contigo.' P.—¿Qué hizo usted después? R.—Nos fuimos a San Juan. P.—¿Con quién más fué? R.—Con el Sr. Cristino Meléndez, en automóvil." Continuó diciendo que en San Juan le preguntó Arias si era casado, su edad, si su hijo era legítimo, la edad de éste y si iba a la escuela, a lo que le contestó. Se le preguntó entonces: "¿Y qué hicieron ustedes? R.—Nosotros cogimos al poco rato y nos vinimos. P.—¿Alguna persona los acompañó a ustedes? R.—Los únicos que estábamos allí, los mismos tres." A otra pregunta posterior contestó que Arias fué con ellos en el automóvil para Ceiba. Dijo que cuando llegó a su casa subió y se acostó porque tenía el cuerpo adolorido; y continuó diciendo que llegó (Arias) y preguntó por la señora Valentín, a la que hizo las mismas preguntas que le hizo a él sobre edad, etc., y después

ella hizo una cruz en unos papeles en blanco, que nada tenían escrito; que allí hizo él dos cruces en dos papeles en blanco y Sabina hizo dos; que luego en la tienda de Meléndez éste firmó y también Luis Ramos, después de lo cual Arias entregó al testigo un papel amarillo. A repreguntas manifestó que oyó la conversación de su hermano Gil con Arias en el cementerio pero no oyó lo que él declaró respecto a haberle dicho Arias sobre transacción sino de una investigación; que en San Juan no se habló de dinero y que nada le dió Arias allá para firmar. Dice luego que no firmó un papel escrito sino en blanco; que salió para San Juan a las ocho de la mañana y estuvo allí hasta las doce del día. Preguntado cuánto tiempo estuvo en la oficina dijo que en lo que dió su declaración al Sr. Arias y después se fué a la calle y estuvo en San Juan hasta las doce. Luego dijo que salió de la oficina de Arias con él, con Meléndez y con Ramos; que Arias le dijo que iba a Ceiba a tomar declaración a Sabina Valentín; y que llegaron a su casa a las siete de la noche. Preguntado si al llegar fué donde su esposa y le explicó el convenio que había hecho con la compañía contestó así: "Ay, yo no sé"; que no le dijo que firmara. Preguntado cuáles son los documentos que dijo haber firmado en blanco contestó: "Pues como él dijo que diéramos la firma y como no sabíamos leer ni escribir la señora mía firmó primero y vino donde mí y me dice: 'Viejo, firme aquí', pensando que era según me había declarado"; que el papel estaba en blanco sin letras; que firmó un documento que le dió Arias creyendo que era la declaración sobre su edad, la de su señora y la de su hijo; que él no buscó a Meléndez y a Ramos para que lo acompañaran a San Juan sino que ellos se le brindaron; que Meléndez le dijo que iba para San Juan y que si quería podía enseñarle la casa; que Meléndez y Ramos no eran amigos suyos pero como eran más prácticos que él fué en su compañía; que él no los buscó sino que ellos lo buscaron y lo llevaron.

No hemos transcrito íntegramente las declaraciones de

Cristino Meléndez y de Félix Agosto por su mucha extensión pero nos parece que el resumen que de ellas hemos hecho y los pasajes que hemos copiado son suficientes para conocer el carácter de esos testimonios para formar juicio de ellos.

La evidencia de ambas partes en lo referente a la transacción nos convence de que la corte inferior cometió manifiesto error al llegar a la conclusión de que no podía creer y no creía en la existencia de tal contrato de transacción, lo que equivale a decir que no se creyó la declaración del Sr. Arias según la cual se hizo una transacción. Creemos que la preponderancia de la evidencia está claramente a favor de la demandada apelante, según pasaremos a demostrar.

La declaración del testigo Arias nada tiene por sí misma que la haga inverosímil ni indigna de crédito. Parece lo natural que un empleado de una compañía de seguros trate de evitar reclamaciones contra su compañía mediante transacción, aunque crea que ella no tiene responsabilidad, evitándole así las eventualidades de un pleito y los gastos del mismo. Nada censurable vemos en esto que pueda hacer inverosímil o increíble esa conducta. No hubo ni la más remota coacción de su parte para llegar a una transacción con el demandante, en representación de su compañía, pues se limitó a decir al hermano del demandante que cuando lo creyeran conveniente fueran a su oficina de San Juan para tratar de una transacción. Tampoco el hecho de que habiendo ido a Ceiba al día siguiente del accidente para hacer una investigación de él, fuera por la tarde al cementerio cuando enterraban a Esteban Agosto y que en aquel sitio diera su pésame al demandante e hiciera a Gil Agosto la indicación expresada de transacción quita valor a su declaración en el juicio; ni el hecho de que al llegar a la casa de Félix Agosto por la noche para recoger la firma de su esposa estuviera ella reunida con otras personas para rezar un rosario o rezándolo. Por otra parte su declaración respecto al hecho de la transacción quedó comprobada con el documento que en tal sentido firmó en San Juan Cristino Meléndez después de haber hecho una cruz en

él Félix Agosto, y por el otro documento de igual clase suscrito en Ceiba por las cruces de Sabina Valentín y de Félix Agosto en el que Cristino Meléndez y Luis Ramos firmaron como testigos, así como por el cheque por $650 que entonces recibió el demandante, que no es por cantidad insignificante.

En el juicio no fué presentado como testigo Luis Ramos, nombrado alguna vez como Luis Mora, quien parece ser el más inteligente de los tres que estuvieron en San Juan donde Arias y quien según el demandante se portó como un hombre honrado.

En verdad, el testimonio de Arias no fué contradicho substancialmente por el demandante y su testigo Meléndez pues ellos aceptaron que fueron a la oficina de Arias en San Juan, que allí suscribieron ellos un documento que es el de transacción de Félix Agosto sin su esposa en el que no está la firma de Luis Ramos, que llegaron a Ceiba a las siete de la noche acompañados de Arias, que allí firmaron un documento los dos esposos y Meléndez y Ramos como testigos y que Arias entregó al demandante un papel amarillo que es un cheque extendido a favor de los expresados consortes por la compañía aseguradora.

La declaración de Arias no queda destituída de veracidad porque el demandante y Meléndez dijeron que habían ido a San Juan para una investigación que dijo Arias quería hacer, pues Gil Agosto declaró que Arias le dijo que fueran a San Juan para hacer una transacción por dinero; porque Meléndez declaró que en San Juan no hizo Arias investigación alguna; porque Félix Agosto depuso que fué preguntado si era casado, el nombre de su esposa y la edad de ellos y de su hijo, lo mismo que preguntó a Sabina Valentín; y porque si fueron a San Juan para una investigación o no, el hecho es que se llegó a una transacción según los documentos que obran en autos y las firmas reconocidas de ellos. Además, las declaraciones de Félix Agosto y de Meléndez no pueden

destruir la de Arias porque son contradictorias entre sí mismas y una con otra e inverosímiles. Por ejemplo Cristino Meléndez declaró que fué a San Juan porque lo invitó Félix Agosto; luego dijo que él fué a decirle a Félix Agosto que fuera a San Juan, y en otra parte de su declaración manifestó que él estaba en San Juan. Después de haber negado ese testigo que hubiera firmado los documentos de transacción, al serle mostrados reconoció que había puesto en ellos dos firmas, y más tarde admitió que puso cuatro que son las que tienen. También declaró que cuando llegaron a Ceiba estaban rezando pero después dijo que no sabe si estaban rezando o no.

Félix Agosto dijo que vió a Arias cinco o seis veces pero después manifestó que fueron dos. Expresó asimismo que cuando llegó a su casa subió y se acostó porque tenía el cuerpo adolorido, y sin embargo relató lo ocurrido en la sala de la casa con Arias con quien fué después a otra parte donde firmaron los testigos y él recibió de Arias un papel amarillo. Él también dijo que los papeles en los cuales hizo una cruz estaban en blanco pero resulta de ellos mismos que estaban impresos. En otra parte declaró que de San Juan salieron los tres que habían ido, pero después dijo que Arias iba con ellos.

Las declaraciones de esos dos testigos son de tal naturaleza que no pueden destruir la prueba presentada para demostrar que mediante un contrato de transacción el demandante exoneró y relevó a la demandada de toda responsabilidad por la muerte de Esteban Agosto.

Nada encontramos en este caso que demuestre que hubo dolo de parte de Arias para la transacción realizada. Los casos de *Colón* v. *Méndez,* 41 D.P.R. 874 y de *De Jesús* v. *Singer Sewing Machine Co.,* 46 D.P.R. 719, que cita el apelado, no tienen aplicación al presente porque las circunstancias en que en ellos se celebraron las transacciones son distintas a las del presente.

*La sentencia apelada debe ser revocada y dictarse otra*

*declarando sin lugar la demanda sin especial condena de costas.*

El Juez Asociado Señor Wolf no intervino.