JUANA CRUZ GONZÁLEZ, demandante y apelante, *v.* AUTORIDAD DE FUENTES FLUVIALES DE PUERTO RICO y MARYLAND CASUALTY COMPANY, demandadas y apeladas.

Número 11008.

*Sometido:* 5 de marzo de 1954. *Resuelto:* 13 de abril de 1954.

*Carlos E. Colón Cordero* y *Antonio Zapater Cajigas*, abogados de la apelante; *F. Fernández Cuyar* y *Rafael A. González*, abogados de las apeladas.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del tribunal.

El 19 de marzo de 1951 la demandante entabló pleito de daños y perjuicios contra las demandadas por la suma de $25,000 ante el Tribunal Superior con motivo de la muerte de su hija menor. En la misma demanda también solicitó que se declarara nula la carta de pago que anteriormente había firmado en relación con el accidente. Después de un juicio en los méritos, el tribunal sentenciador declaró que la carta de pago era válida y dictó sentencia a favor de las demandadas.

Las conclusiones de hechos del tribunal sentenciador fueron las siguientes:

"1. El día 19 de octubre de 1950, como a las 8:45 de la mañana, la menor Daisy Pagán Cruz, hija legítima de la demandante, bajo cuya custodia vivía, fué arrollada y muerta por el camión marca Dodge, licencia H-80195, propiedad de la demandada, Autoridad de Fuentes Fluviales de Puerto Rico, en ocasión en que dicho vehículo era conducido a velocidad exagerada por un empleado de dicha demandada, en el curso de su empleo y sin que éste tomase las debidas precauciones para evitar dicho lamentable accidente, el cual acaeció en una carretera pública en el término municipal de Jayuya, Puerto Rico.

"2. Cinco o seis días después de acaecido el referido accidente, el señor Oscar Álvarez Torres, ajustador de la codemandada Maryland Casualty Co., aseguradora de la demandada Autoridad de Fuentes Fluviales de Puerto Rico [por la suma de $10,000], por instrucciones de su dicha principal, hizo contacto con la demandante en lugar próximo a su residencia con el propósito de llegar a un acuerdo y transigir la reclamación que la madre de la menor pudiese tener contra las aquí demandadas. [El padre de la menor había fallecido con anterioridad al accidente. Al momento en que éste ocurrió, la demandante estaba casada con su segundo esposo René Rivera.]

"3. El referido ajustador halló al esposo de la demandante, señor René Rivera, en la carretera, y le indicó que deseaba hablar con la demandante a fin de discutir la referida transacción.

"4. René Rivera procuró y trajo a la demandante a donde el referido ajustador, en donde éste explicó a ambos la misión que llevaba, diciéndoles que estaba autorizado a transigir la reclamación que hubiese por la suma máxima de $1,000; invitó a la demandante a que discutiese el asunto con su esposo, y éste se retiró a deliberar con su esposa por espacio de 15 minutos; y luego de haber consultado entre sí los cónyuges, aceptaron la oferta, firmando la demandante un documento o carta de relevo en presencia del testigo Manuel A. Pérez, a quien conocía la demandante desde niña, y en presencia de su esposo. En el acto el ajustador le hizo entrega a la demandante de un cheque por $1,000 en transacción de la referida reclamación.

"5. La demandante entendió bien que se trataba de una transacción por la muerte de su hija menor. A este efecto, ella declaró que sabía que estaba recibiendo esta suma por la muerte de su hija, cuando cambió el cheque.

"6. Además a la demandante se le leyó la carta de pago antes de firmarla en presencia de testigo, y entendió su contenido, suscribiéndola voluntariamente, habiéndose asesorado previamente con su esposo y sin que el ajustador se valiese de artimañas, dolo o maquinaciones tendenciosas para obtener, como obtuvo, su consentimiento. Antes de firmar dicha carta de pago, el ajustador le dijo a la demandante que venía a traérle Mil Dólares porque la compañía no pagaba más y aún si ella (la demandante) fuera a la corte no iba a conseguir más porque era una menor que se había perdido y no un jefe de la casa.

"7. La demandante antes y después de haberse consumado la transacción, tuvo amplia oportunidad de no llevarla a efecto, o de haber sido ello posible en ley, de repudiarla. Sin embargo, su conducta anterior y posterior a la consumación del contrato fué una de aceptación y ratificación. Ella declaró que luego de suscrita la carta de pago y recibido el cheque, el testigo de su firma, Manuel A. Pérez, le dijo que ella había cometido un 'horror' al transigir, por lo que ambos creyeron era una suma pequeña. Sin embargo, la demandante guardó el cheque durante varios días, y luego lo cobró en el banco. Declaró también que 'a pesar de que su esposo le dijo que le habían dado poco dinero, ella fué al banco y cambió el cheque'. Y declaró así mismo que luego de

haber invertido el dinero en la compra de una casa, como a los cuatro meses fué donde un abogado para incoar la acción del presente caso." (Corchetes nuestros.)

En apelación, la demandante alega (1) que el tribunal sentenciador "cometió error de derecho y en la apreciación de la prueba" al resolver que el contrato transaccional celebrado entre las partes era válido, y (2) que el tribunal sentenciador cometió error al concluir que la demandante, por sus actuaciones posteriores y en particular al cambiar el cheque, ratificó la transacción.

El primer señalamiento de error requiere que (1) determinemos los hechos y (2) una vez establecidos éstos, que examinemos la cuestión legal con respecto a la validez de la carta de pago a la luz de dichos hechos. Por consiguiente pasamos primero al problema de los hechos.

Durante el juicio se estipuló que de declarar ciertos testigos su testimonio sería al efecto de que la menor resultó muerta debido a la negligencia de un empleado de la Autoridad de las Fuentes Fluviales al manejar un camión perteneciente a ésta. Las demandadas no ofrecieron testimonio alguno sobre la cuestión de negligencia. Y no impugnan la conclusión de hecho del tribunal sentenciador al efecto de que la menor resultó muerta como resultado de la negligencia de un empleado de la Autoridad.

El único testimonio oral que el tribunal sentenciador tuvo ante sí fué el de Álvarez, el ajustador. La demandante había declarado en un juicio anterior ante un juez que renunció dejando el caso sin resolver. Las partes estipularon que el actual juez sentenciador tomara en consideración la transcripción del testimonio de la demandante en el juicio anterior. Esto creó una situación poco usual ya que había algunas contradicciones entre el testimonio de Álvarez y el de la demandante con respecto a las circunstancias bajo las cuales se firmó la carta de pago. Álvarez negó haberle dicho a la demandante que la corte no le concedería más de $1,000 por haber

sido una menor la que resultó muerta y no un jefe de familia. Pero el tribunal sentenciador no dió crédito a este testimonio. Por el contrario, creyó el testimonio estipulado de la demandante al efecto de que Álvarez le había hecho a ella tal manifestación. Las demandadas no impugnan esta conclusión de hecho y nosotros la dejamos intacta.

Por otro lado, el tribunal sentenciador aparentemente resolvió a favor de Álvarez las otras contradicciones entre el testimonio oral de éste y el testimonio estipulado de la demandante. La demandante declaró que ella no consultó con su esposo antes de firmar la carta de pago; que ella le dijo a Álvarez que necesitaba algún tiempo para considerar la oferta de transacción, pero que Álvarez insistió en que ella tenía que decidirse inmediatamente porque él tenía que irse; que no le leyeron la carta de pago antes de ella firmarla; y que ella estaba nerviosa y casi loca por haber perdido su hija seis días antes y por consiguiente no sabía lo que estaba haciendo cuando firmó la carta de pago y aceptó el cheque. El testimonio oral de Álvarez apoya las conclusiones de hechos del tribunal sentenciador sobre estas cuestiones. No podemos decir que la corte sentenciadora venía obligada a rechazar el testimonio oral de Álvarez y por el contrario a darle crédito al testimonio estipulado de la demandante en relación con estas cuestiones.

En vista de lo anteriormente expuesto, no encontramos error en la actuación de la corte sentenciadora al apreciar la evidencia, con excepción de un solo punto que discutimos más adelante. Por tanto pasamos a aquella parte del primer señalamiento en el cual la demandante alega que, bajo los hechos tal y como los halló probados la corte sentenciadora, la carta de pago era nula como cuestión de derecho.

En la conclusión de hecho núm. seis se dice: "sin que el ajustador se valiese de artimañas, dolo o maquinaciones" él obtuvo el consentimiento de la demandante en la carta de

pago. Esta manifestación está en una zona crepuscular que permite que se le considere tanto como la conclusión de un hecho definitivo como una conclusión de derecho. Como conclusión de derecho, desde luego, la misma no nos obliga. Aun cuando aceptemos las conclusiones de hechos del tribunal sentenciador, compete a este Tribunal en última instancia exponer la regla de derecho aplicable a los hechos. Y si la tratamos como la conclusión de un hecho definitivo llegamos al mismo resultado: Si los hechos intermedios que halló probados el tribunal sentenciador en realidad demuestran dolo, no puede permitirse que subsista la conclusión del hecho definitivo de que no ocurrió dolo. *De Soto* v. *Clínica Industrial*, 71 D.P.R. 876, 880-1; *Mercedes Bus Line, Inc.* v. *Tribunal de Distrito*, 70 D.P.R. 690, 694-5; *Meléndez* v. *Metro Taxicabs*, 68 D.P.R. 766, 770. En su consecuencia debemos determinar si la conclusión intermedia—que el ajustador le dijo a la demandante ". . . que venía a traerle Mil Dólares porque la compañía no pagaba más y aun si ella (la demandante) fuera a la corte no iba a conseguir más porque era un menor que se había perdido y no un jefe de la casa . . ."—requiere que se resuelva que la carta de pago era nula como cuestión de derecho.

El problema aquí estriba en si la carta de pago era nula por el fundamento de que fué obtenida mediante dolo. Uno de los requisitos para que haya contrato es el "[c]onsentimiento de los contratantes." Artículo 1213 Código Civil, ed. de 1930. Sin embargo, a tenor con el artículo 1217 "[s]erá nulo el consentimiento prestado por error, violencia, intimidación o dolo". El dolo que vicia el consentimiento aparece definido en el Código Civil como sigue:

"Artículo 1221.—Hay dolo cuando con palabras o maquinaciones insidiosas de parte de uno de los contratantes, es inducido el otro a celebrar un contrato que sin ellas no hubiera hecho.

"Artículo 1222.—Para que el dolo produzca la nulidad de los contratos, deberá ser grave y no haber sido empleado por las dos partes contratantes.

"El dolo incidental sólo obliga al que lo empleó a indemnizar daños y perjuicios." (¹)

Las demandadas no alegan ahora y nunca han alegado que cuando se efectuó la transacción, existía duda razonable alguna en cuanto a su responsabilidad para con la demandante por la muerte de la menor. Tampoco alegan que la oferta de transacción de $1,000 estaba predicada en parte en tal duda razonable. Por el contrario, no impugnaron el testimonio estipulado al efecto de que el accidente se debió a la negligencia de un empleado de la Autoridad que actuaba en el curso de su empleo. Y Álvarez declaró que él nada sabía sobre este caso cuando recibió instrucciones de que se trasladara de Utuado, donde estaba investigando otro caso, a Jayuya; que él preparó el cheque de $1,000 y la correspondiente carta de pago en Utuado antes de salir para Jayuya; que en Jayuya habló con los testigos que eran empleados de la Autoridad y con el médico que practicó la autopsia antes de ver a la demandante y hacerle la oferta de transacción.

Por no aparecer de los autos absolutamente nada que la apoye, rechazamos la manifestación en la conclusión de hecho núm. 4 de la corte sentenciadora al efecto de que el ajustador le dijo a la demandante y a su esposo que ". . . estaba autorizado a transigir la reclamación *que hubiese* por la suma máxima de $1,000." (Bastardillas nuestras.) Álvarez no declaró ni que él pensó ni que le dijo a la demandante que su reclamación era debatible. En verdad, no declaró en cuanto a qué reveló, de haber revelado algo, su investigación con respecto a la causa del accidente, mientras que durante el juicio las demandadas admitieron su responsabilidad. En su testimonio Álvarez dió como sus únicos motivos para hacer la oferta de transacción por $1,000 (1) que él creyó que era razonable, y (2) que ésa era la cantidad máxima que él estaba autorizado a ofrecer.

Por consiguiente tenemos un caso de responsabilidad ad-

---

(¹) Véase también el artículo 1716 del Código Civil.

mitida en el cual un ajustador de seguros a los seis días de haberse causado la muerte a una niña de seis años de edad visita cerca de su casa en el campo a la madre que es prácticamente analfabeto,(²) le dice que la corte no le concedería más de $1,000 porque la persona fallecida era una menor y no el jefe de familia, y a los pocos minutos, después de haber consultado tan sólo con su marido que era similarmente analfabeto, obtiene su firma en consideración del pago de $1,000 en una carta de pago que el ajustador había preparado antes de enterarse de los hechos del caso.

No podemos convenir con el tribunal sentenciador en cuanto a que bajo las circunstancias de este caso la manifestación del ajustador a la demandante al efecto de que en 1950, cuando ocurrió este accidente, una corte no le hubiera concedido más de $1,000 no constituía "grave dolo" bajo el artículo 1222 del Código Civil y era la clase de exageración o "engaño burdo, fácilmente comprobable . . . que tienen lugar en ferias y mercados", véase escolio 4 *infra*. Por el contrario, somos de opinión que el ajustador, que había tenido dos años de experiencia en "infinidad" de casos, sabía que esta manifestación era falsa de toda falsedad; que su intención era que la demandante confiara en su manifestación; y que la demandante—campesina ignorante, sencilla, que aun no podía sentirse completamente normal tan sólo seis días después de este funesto accidente—confió en esta falsa y fraudulenta representación y fué por ella inducida a aceptar la oferta del ajustador y a firmar la carta de pago.

Creemos que el consentimiento de la demandante fué viciado por el dolo de que ella fué objeto y que la carta de pago era nula. Este caso cae dentro de la regla establecida por nosotros en *Rivera* v. *Sucn. Díaz Luzunaris*, 70 D.P.R. 181. En el caso de *Rivera* dijimos a la pág. 185 y a la pág. 187, escolio 6, que el dolo tiene un alcance muy amplio e incluye

---

(²) No hay controversia en cuanto a que la demandante tenía sólo instrucción de primer grado y que podía firmar pero no sabía leer ni escribir.

"el engaño, el fraude, la falsa representación, la indebida influencia . . ."(3) También citamos con aprobación a las págs. 185-6 el comentario de Manresa que dice así:

" 'La esencia de esta especie de dolo se encuentra en el engaño que obtiene un consentimiento del engañado, arrancándolo, o a lo menos influyendo en él. Esto quieren indicar las palabras "o maquinaciones insidiosas", a que se refiere la ley, las cuales comprenden las falsas promesas, la exageración de esperanzas o beneficios, *el abuso de la confianza,* la ficción de nombre, cualidades *o poder,* las mil formas, en suma, del engaño, que pueden alucinar a un contratante, produciendo un consentimiento viciado, . . .' Manresa, Comentarios al Código Civil Español, t. 8 (2da. ed. 1907) pág. 657. (Bastardillas nuestras.)"(4)

La cuestión de si una carta de pago se obtiene por dolo depende de los hechos de cada caso. Nuestros casos anteriores que tratan de transacciones de casos de accidentes de automóvil por consiguiente no arrojan mucha luz sobre el problema específico ante nos. Las doctrinas generales en ellos expuestas están de acuerdo con el resultado a que hemos llegado en este caso. En *Colón* v. *Méndez,* 41 D.P.R. 874, confirmamos una sentencia a favor de un demandante en un pleito por lesiones personales. Sostuvimos la actuación del tribunal sentenciador al negarse a dar eficacia a una carta de pago otorgada por el demandante a favor del demandado. Nuestra opinión dispone de este punto en un párrafo a la pág. 875 como sigue:

"La carta de descargo fué otorgada unas dos semanas después del accidente. En aquel entonces el demandante estaba re-

---

(3) *Cf. Rivera* v. *Sucn. Díaz Luzunaris,* supra, opinión concurrente a la pág. 199.

(4) La cita de Manresa aplicable a los hechos de este caso es la que aparece en el texto de esta opinión y no la cita en que descansó el tribunal sentenciador, que dice así:

"La gravedad del dolo, a que se refiere el art. 1270, necesaria para producir la nulidad del contrato, se refiere, no a su influencia, y sí a su importancia, significando el precepto legal que no basta invocar un engaño burdo, fácilmente comprobable, y viene a excluir de los efectos del dolo las pequeñas y usuales alteraciones de la verdad, casi inseparables, por desgracia, de las transacciones, señaladamente de las que tienen lugar en ferias y mercados." (8 Manresa Código Civil 426—Vol. II 5ta. Edición)."

cluído en cama y continuó así por espacio de dos meses o más.. No sabía leer ni escribir y en el momento del supuesto convenio no le fué posible poner su marca en el mismo sin la ayuda de otra persona. El juez de distrito declaró que la carta de descargo había sido obtenida mediante fraude, falsas representaciones y engaño y fué también de opinión que la causa (*consideration*) del mismo era inadecuada. Concurrimos con este criterio. No hubo conjunción de voluntades y por tanto no hay contrato o convenio que pueda hacerse valer."

Un examen de los autos originales ante este Tribunal en el caso de *Colón* demuestra que el demandante recibió $40 por firmar la carta de pago y que finalmente se le dieron $400 por sus lesiones y $98 por salarios dejados de percibir. Los autos también demuestran que el demandante declaró que el agente de la compañía de seguros le dijo que los $40 cubrían sólo sus dietas y no su reclamación por las lesiones; el agente negó este testimonio. Si bien de la opinión del tribunal sentenciador y de este Tribunal no surge enteramente claro, aparentemente el testimonio del demandante sobre este punto fué creído y tomado en consideración en apoyo de la conclusión en el caso de *Colón* de que la carta de pago era nula.

En el caso de *De Jesús* v. *Singer Sewing Machine Co.*, 46 D.P.R. 719, confirmamos una sentencia a favor de la demandada por el fundamento de que el demandante había incurrido en negligencia contribuyente. Por tanto estimamos que era innecesario examinar la validez de una carta de pago firmada por el demandante en consideración a la suma de $60. Sin embargo, advertimos en un *dictum* a la pág. 724 que "Actos de esta naturaleza, realizados con una persona necesitada, a raíz de sufrir un accidente, sin estar aconsejada por un abogado, deben ser escrupulosamente investigados para evitar que una parte pueda derivar ventajas de su conducta fraudulenta o ilegal y evadir así su responsabilidad . . .".

En *Agosto* v. *Porto Rican Express Co.*, 47 D.P.R. 897, revocamos una sentencia a favor del demandante por daños debidos a la muerte de su hijo de 17 años, como resultado de un

accidente de automóvil. Resolvimos que el tribunal sentenciador cometió error al apreciar la evidencia y que la transacción y la carta de pago envueltas en dicho caso eran válidas. Pero la única cuestión presentada en el caso de *Agosto* era si el demandante había celebrado a sabiendas un contrato de transacción. El hecho de que se transigiera un caso de muerte por sólo $650 no fué por sí solo suficiente para viciar la transacción, especialmente porque la compañía de seguros aparentemente alegaba, quizás con algún fundamento, que las demandadas no eran responsables del accidente. A los fines del presente caso basta citar el lenguaje del caso de *Agosto* a la pág. 908 al efecto de que "Nada encontramos en este caso que demuestre que hubo dolo de parte de Arias [el agente de seguros] para la transacción realizada. Los casos de *Colón* v. *Méndez*, 41 D.P.R. 874 y de *De Jesús* v. *Singer Sewing Machine Co.*, 46 D.P.R. 719, que cita el apelado, no tienen aplicación al presente porque las circunstancias en que en ellos se celebraron las transacciones son distintas a las del presente." (Corchetes nuestros.)

Creemos que bajo los hechos de este caso la carta de pago aquí envuelta sería declarada nula en casi todas las jurisdicciones donde impera el derecho común. Véanse Anotaciones, 121 A.L.R. 1270; 21 A.L.R. 2d 272; 164 A.L.R. 402; 48 A.L.R. 1462, complementado en 117 A.L.R. 1022; 96 A.L.R. 1001; *Restatement, Contracts*, sec. 470 *et seq.*; *Restatement, Torts*, sec. 525 *et seq.*; Williston *on Contracts*, edición revisada, sec. 1486 *et seq.*; Prosser *on Torts*, pág. 701 *et seq.*; *Dice* v. *Akron, C. & Y. R. Co.*, 342 U. S. 359; *Ricketts* v. *Pennsylvania R. Co.*, 153 F.2d 757 (C. A. 2, 1946); *Sainsbury* v. *Pennsylvania Greyhound Lines*, 183 F.2d 548 (C. A. 4, 1950); *Whitehead* v. *Montgomery Ward & Co.*, 239 P.2d 226 (Ore., 1951); *Heuter* v. *Costal Air Lines*, 79 A.2d 880 (N. J., 1951). *Cf. Camerlin* v. *New York Central R. Co.*, 199 F.2d 698 (C. A. 1, 1952).

El segundo señalamiento de error ataca la conclusión

del tribunal sentenciador al efecto de que la demandante, por sus actuaciones posteriores y en particular al cambiar el cheque, ratificó la transacción. Las demandadas citan el artículo 1263 del Código Civil en apoyo de esta conclusión del tribunal sentenciador.(5) En vista del hecho de que la demandante habló sólo con personas de su misma preparación, no podemos ver cómo bajo todas las circunstancias de este caso su actuación al cambiar el cheque unos días después de recibirlo constituyera ratificación de la transacción a tenor con el artículo 1263. Rechazamos un argumento similar en una situación análoga en que estaban envueltos los artículos 1255 y 1256 del Código Civil en el caso de *Rivera* v. *Sucn. Díaz Luzunaris*, supra. Véanse *Union Pac. R. Co.* v. *Zimmer*, 197 P.2d 363, 368 (Cal., 1948); *Komer* v. *Shipley*, 154 F.2d 861, 865–6 (C. A. 5, 1946); *Whitehead* v. *Montgomery Ward & Co.*, supra, 237. El tribunal sentenciador cometió error al resolver que la demandante ratificó la transacción con sus actuaciones posteriores.

■ Con respecto a la cuantía de los daños, la única evidencia ante el tribunal sentenciador fué el testimonio estipulado de la demandante. Por tanto no sería de ningún fin práctico devolver el caso para que el juez sentenciador fije el importe de los daños. Toda vez que estamos en la misma posición del tribunal sentenciador en relación con este punto, fijaremos los daños en nuestra sentencia.

Por los motivos antes expuestos, *la sentencia del Tribunal Superior a favor de las demandadas será revocada y se dictará nueva sentencia concediendo a la demandante daños ascendentes a $12,000, costas y $1,500 para honorarios de abogado, debiendo deducirse de la suma concedida para daños los $1,000 ya recibidos por la demandante.*

---

(5) Los artículos 1261 y 1263 prescriben: "La acción de nulidad queda extinguida desde el momento en que el contrato haya sido confirmado válidamente." "La confirmación puede hacerse expresa o tácitamente. Se entenderá que hay confirmación tácita cuando con conocimiento de la causa de nulidad y habiendo ésta cesado, el que tuviere derecho a invocarla ejecutase un acto que implique necesariamente la voluntad de renunciarla."