LUISA GUADALUPE DE VÉLEZ RIECKEHOFF, en representación de su esposo CARLOS VÉLEZ RIECKEHOFF, peticionaria, *v.* JUAN S. BRAVO, ALCAIDE DE LA CÁRCEL DE DISTRITO DE SAN JUAN y HON. VICENTE GÉIGEL POLANCO, PROCURADOR GENERAL DE PUERTO RICO, demandados.

Núm. 465.—*Sometido:* Noviembre 27, 1950. *Resuelto:* Diciembre 18, 1950.

*Rafael V. Pérez Marchand* y *Santos P. Amadeo,* abogados de la peticionaria; *Hon. Procurador General Vicente Géigel Polanco, J. Rivera Barreras, Fiscal del Tribunal Supremo* y *Frank Vizcarrondo Vivas, Fiscal Auxiliar,* abogados de los demandados.

EL JUEZ PRESIDENTE SEÑOR DE JESÚS emitió la opinión del tribunal.

Luisa Guadalupe de Vélez radicó en este Tribunal una petición de hábeas corpus en representación de su esposo, Carlos Vélez Rieckehoff, alegando que éste se halla detenido desde el 4 de noviembre último y que desde entonces, tanto a ella como a los abogados Santos P. Amadeo y R. Pérez Marchand, a quienes designó para su defensa, se les ha impedido comunicarse con él. Que so pretexto de que el detenido es nacionalista, a quien se le imputa una infracción a la Ley núm. 53 de 1948 (Sesión Extraordinaria, pág. 171), y a virtud de un Reglamento promulgado por el Procurador General de Puerto Rico el 16 de noviembre último, se ha prohibido a los referidos abogados que juntos o separadamente se comuniquen con el confinado exigiéndoseles como condición previa para entrevistarse con él, que den cumplimiento a las disposiciones del citado Reglamento y especialmente a lo prescrito en la Carta Circular de noviembre 21 último expedida por el mismo funcionario, disposiciones que en lo pertinente, respectivamente, pueden sintetizarse así:

LAS. DE REGLAMENTO.

(a) A los efectos de preparar la defensa de cualquier detenido o arrestado bajo acusación en las instituciones penales de Puerto Rico, los abogados podrán entrevistar a un confinado una vez por semana, a menos que justifiquen a juicio del Alcaide la necesidad de ver a su cliente con más frecuencia.

(b) En caso de que un confinado hubiera encomendado su defensa a más de un abogado, sólo podrá entrevistarlo en ocasión de cada visita, uno de ellos.

(c) El abogado deberá notificar por escrito al Alcaide de la institución por lo menos 24 horas antes de la entrevista su intención de llevarla a cabo y el objeto de ésta.

(d) La visita será únicamente entre el abogado y el confinado, sin que pueda estar presente ninguna otra persona con excepción del guardia penal encargado de la custodia del salón de visitas.

LAS DE LA CIRCULAR.

La Circular dispone que el Reglamento de 16 de noviembre de 1950 se aplicará única y exclusivamente a las visitas de abogados a *los detenidos por los recientes actos de terrorismo, atentados,* etc., promovidos por la jefatura de los nacionalistas.

Alegó además la peticionaria que las referidas disposiciones del Reglamento y Carta Circular, violan los derechos constitucionales del detenido por las razones que expone en la petición, a las cuales nos referiremos más adelante al discutir las cuestiones levantadas por la peticionaria. También alegó la peticionaria que no existe causa probable para la detención de su esposo; y que la fianza de $25,000 exigídale para su libertad provisional es excesiva.

Termina la petición con súplica de que mediante el auto de hábeas corpus solicitado, se anulen las referidas disposiciones del Reglamento y Carta Circular y se ordene la excar-

celación del confinado por no existir causa probable para su detención.

A base de dicha petición y del memorándum de autoridades que se acompañó, expedimos auto de hábeas corpus y el día señalado para la vista compareció el Alcaide de la Cárcel de Distrito de San Juan trayendo consigo al confinado. En ese acto presentó una contestación en la cual entre otras cosas se negó que no existiera causa probable para el arresto; que la cantidad en que se fijó la fianza para decretar la libertad provisional fuera irrazonable, y se alegó que después de entrar en vigor el Reglamento y la Carta Circular, los abogados del confinado no han solicitado del Alcaide ni de ningún otro funcionario que se les permita comunicarse con su cliente. Termina la contestación exponiendo los motivos que tuvo el Procurador General para aprobar el Reglamento y suplicando se desestime la petición de hábeas corpus. Como apuntáramos anteriormente, nos referiremos a la prueba presentada al considerar separadamente cada una de las cuestiones a ser discutidas en esta opinión.

I

■■ Lógicamente la existencia de causa probable parece ser la primera cuestión a considerar, pues de no existir, procedería la inmediata excarcelación del detenido, sin necesidad de considerar las demás cuestiones suscitadas.

La Ley que se alega infringida es la núm. 53 de 10 de junio de 1948 cuyo artículo 1 prescribe que será delito:

"1. fomentar, abogar, aconsejar o predicar, voluntariamente o a sabiendas la necesidad, deseabilidad o conveniencia de derrocar, paralizar o destruir el gobierno insular, o cualquier subdivisión política de éste, por medio de la fuerza o la violencia;
 " . . . . . . . .

"3. organizar o ayudar a organizar cualquier sociedad, grupo o asamblea de personas que fomenten, aboguen, aconsejen o prediquen la derrocación o destrucción del gobierno insular, o de cualquier subdivisión política de éste, por medio de la fuerza o la violencia."

Hace años existe en esta Isla un movimiento separatista impulsado por un grupo de individuos, encaminado a conseguir la separación de Puerto Rico de los Estados Unidos por medio de la fuerza y la violencia. Prueba de ello es que en el caso de *Albizu* v. *United States*, 88 F. 2d 138 (C.C.A. 1, 1937), al revisar en apelación una sentencia de la Corte de Distrito de los Estados Unidos para Puerto Rico, dictada contra un grupo de líderes nacionalistas por un delito de conspiración para derrocar por la fuerza y la violencia el gobierno de los Estados Unidos en Puerto Rico, la Corte de Apelaciones de los Estados Unidos para el Primer Circuito, luego de detallar la evidencia presentada se expresó así:

"Hubo abundante evidencia de muertes y otros actos de violencia en los cuales estaban envueltos miembros del Partido Nacionalista, actos que constituían el resultado de los discursos enardecedores y revolucionarios de Albizu y de los artículos publicados en 'La Palabra' por Corretjer y en los otros periódicos mencionados, especialmente en 'Armas' editado por el acusado Vélez [se refiere a Clemente Soto Vélez] y en consonancia con las resoluciones adoptadas en la convención celebrada en Caguas el 8 de diciembre de 1935."

De los sucesos de la semana del 30 de octubre de 1950 tomamos conocimiento judicial—*De Castro* v. *Junta Comisionados*, 59 D.P.R. 676; *Pueblo* v. *Torregrosa*, 57 D.P.R. 775—sucesos que culminaron en la Resolución Concurrente núm. 1 de la Asamblea Legislativa de Puerto Rico de 8 de noviembre de 1950, de la cual también tomamos conocimiento judicial. En ésta se dice:

"POR CUANTO: Como resultado de·estas tácticas el lunes 30 de octubre miembros del grupo nacionalista asaltaron la residencia oficial del Gobernador de Puerto Rico con ánimo de asesinarlo. Dentro de las siguientes 72 horas miembros del grupo nacionalista atacaron cuarteles de policía, incendiaron hogares, asaltaron hospitales y llevaron su campaña de trágica irresponsabilidad suicida hasta la capital nacional intentando asesinar al Presidente Truman; . . . . . ."

Sentadas estas bases, veamos ahora si la evidencia presentada por el Fiscal es suficiente para demostrar la existencia de causa probable para la detención.

Entre otras, el Fiscal presentó en evidencia la declaración jurada de José A. Rodríguez, Segundo Teniente de la Policía Insular, prestada en Ciales el 8 de noviembre de 1950 ante el Fiscal Especial José Dávila Ortiz, en la cual dijo que desde el año 1948 que presta servicios en Ciales, conoce al detenido, que le consta es un líder nacionalista y entre otras cosas dice en su declaración:

". . . Que también he oído al Sr. Carlos Vélez Rieckehoff decir en Ciales que todo nacionalista tiene que estar dispuesto a ofrecer su vida y su sangre por la causa de la revolución y la independencia de Puerto Rico pero no lo he oído nunca hablar en tribuna. Estas manifestaciones él las hacía a grupos de personas en las calles y se pasa haciendo. propaganda constantemente en favor del derrocamiento del Gobierno de Puerto Rico en cualquier forma que sea incluyendo el uso de las armas y la revolución."

Asimismo presentó el Fiscal la declaración jurada de José A. Vázquez, de la Policía Secreta, prestada ante el mismo Fiscal Especial, en la que entre otras cosas asegura que el 18 de diciembre de 1949, mientras se celebraba la Asamblea General del Partido Nacionalista en Arecibo, en un receso de la misma oyó a Vélez Rieckehoff decir, dirigiéndose a un grupo de nacionalistas: "Este gobierno lo tenemos que tumbar aunque tenga que correr la sangre." Estas manifestaciones, de ser ciertas, unidas a los sucesos acaecidos en la semana del 30 de octubre, son a nuestro juicio suficientes para establecer causa probable. Véase *Gitlow* v. *New York*, 268 U. S. 652, 669 (1925). [1]

---

[1] La Corte Suprema de los Estados Unidos ha sostenido que para que sea válida la aplicación de un estatuto que restringe la libre emisión del pensamiento, cuando las ideas vertidas sean contrarias al bienestar público, debe probarse que existe un peligro claro e inmediato (*clear and present danger*) de que esas ideas subversivas producirán el mal que el estatuto trata de evitar. *Communications Ass'n.* v. *Douds,* 339 U. S. 382 (1950); *Schenck* v. *United States,* 249 U. S. 47 (1919) y véase también

## II

■■ Sostiene, sin embargo, la peticionaria que la prác-
tica de admitir declaraciones juradas para probar la existen-
cia de causa probable en procedimientos de hábeas corpus es
errónea porque está basada en jurisprudencia del estado de
California donde en el examen preliminar el acusado tiene
derecho a estar presente y a repreguntar los testigos del go-
bierno; y que habiendo tenido esa oportunidad es innece-
sario volvérsela a brindar cuando las mismas declaraciones
o cualquiera de ellas fueren luego presentadas en evidencia
en un procedimiento de hábeas corpus para probar la exis-
tencia de causa probable para la detención. Pero se ha re-
suelto por la Corte Suprema de los Estados Unidos, que la
vista preliminar que existe en otras jurisdicciones no forma
parte del debido procedimiento de ley. *Lem Woon* v. *Oregon*,
229 U. S. 586 (1913); *Palko* v. *Connecticut*, 302 U. S. 319
(1937). Siendo ello así, al recibirse en evidencia en este
caso las declaraciones juradas para probar la existencia de
causa probable, no se privó al detenido del debido procedi-
miento de ley, pues si dichas declaraciones son suficientes
para justificar la iniciación de un proceso, sin que el dete-
nido haya tenido la oportunidad de repreguntar los testigos
en su contra, *a fortiori* deben ser suficientes para establecer
la causa probable que justifique la denegación de un hábeas
corpus, si las mismas prima facie tienden a probar la comi-
sión del delito imputado. De lo contrario, todo acusado, me-
diante la radicación de un hábeas corpus, obtendría la vista
preliminar que el estatuto no le concede y que como hemos
visto no es parte integral del debido proceso de ley.

## III

■ Sostiene también la peticionaria que las declaracio-
nes en cuestión no dieron base al fiscal para ordenar la en-

---

*United States* v. *Dennis*, 183 F.2d 201 (C.C.A. 2, 1950), *cert.* concedido
en 340 U. S. 863. Habida cuenta de lo expuesto en el texto de esta
opinión y de lo demás que aparece de los autos en relación con la exis-
tencia de causa probable, somos de opinión que existió en el presente caso
el peligro claro e inmediato exigido por la jurisprudencia.

carcelación porque según ella el magistrado que ordena la encarcelación debe ser el mismo que investiga el caso.

En apoyo de su tesis invoca el artículo 72 del Código de Enjuiciamiento Criminal, que contiene un modelo que el Fiscal puede seguir para redactar la acusación, y en el cual se indica que al pie de la acusación el Fiscal expresará bajo juramento que la misma está basada en la declaración jurada de testigos examinados por él. Al mismo efecto invoca el caso de *Ex parte Williams*, 199 P. 347 (Cal. Dist. Ct. App., 1921).

En Puerto Rico, a diferencia de California, y a virtud de los artículos 45 y 46 del Código de Enjuiciamiento Criminal(2), los jueces municipales y aún los de paz están facultados para practicar la investigación en casos de supuestos delitos *felonies*, y a base de esas declaraciones el Fiscal puede radicar la acusación. Artículo 3, Código de Enjuiciamiento Criminal. Si en tales circunstancias el Fiscal puede radicar la acusación, con mayor razón puede ordenar la encarcelación.

## IV

Se queja el detenido de que la fianza es excesiva y asegura que todas sus gestiones para conseguir fiadores por esa cantidad han resultado inútiles debido al montante de la misma así como al hecho de ser él nacionalista. Para

---

(2) Los artículos 45 y 46 del Código de Enjuiciamiento Criminal disponen:

"Artículo 45.—Cuando se acuse a una persona de la perpetración de un delito que no fuere de la competencia de un juez de paz, éste, después de practicar una averiguación para cerciorarse si el delito ha sido o no cometido, y convencido que sea de que el delito se ha perpetrado y de que existen causas probables para suponer que el acusado sea el autor, ordenará la detención de éste o admitirá que preste fianza, según la naturaleza del caso, para que comparezca ante la corte de distrito a responder del cargo que se le imputa. Si no existieren pruebas de que el delito haya sido cometido, o causas probables que demuestren la relación que el acusado tenga con su perpetración, éste será puesto en libertad.

"Artículo 46.—En los casos de delitos graves (*felony*), si el juez de paz deseare que el fiscal concurra a la celebración del examen, dicho funcionario puede comparecer, siempre que no estuviere ocupado en el tribunal en la substanciación de algún proceso criminal."

sostener su tesis, los abogados del detenido llamaron a declarar en primer término a la peticionaria, quien dijo que había hecho gestiones para conseguir fiadores para su esposo y que habían resultado infructuosas. Repreguntada por el Fiscal declaró que había hecho gestiones en Ciales con Antonio Vicéns, Alvaro Corrada, Santiago Ruiz, y con nadie más. Manifestó además que la finca que su esposo posee en arrendamiento pertenece a una tía de él, produce unos 60 qqs. de café y, finalmente, a preguntas de uno de los jueces de este Tribunal, manifestó que· en opinión de ella, no podría conseguir fiadores por más de $8,000 ó $10,000.

Declaró en segundo término el propio detenido manifestando que hace cuatro años vive en Ciales y no tiene intimidad con ninguna de las personas que residen allí y que dichas personas no lo fiarían por ser nacionalista; que ninguno de sus parientes, hasta donde él sabe, podría fiarlo por una cantidad mayor de $5,000; que su tía, Ana Rieckehoff, no podría fiarlo porque la finca que le ha cedido en arrendamiento está afecta a una hipoteca por $10,000 a favor de The Federal Land Bank of Baltimore.

A nuestro juicio, no obstante la situación económica del detenido, la naturaleza del delito imputado y las escasas gestiones practicadas para conseguir fiadores, no justifican la reducción de la fianza.

## V

■ Se alega en la petición que a virtud del Reglamento y de la Carta Circular, se impidió a los abogados visitar al detenido, a menos que notificaran por escrito su intención de visitarlo, con 24 horas de anticipación y que aún con dicho aviso uno solo de ellos podría visitar al detenido en cada ocasión. El Alcaide negó esta alegación, pero por la evidencia practicada estimamos probado que después de promulgado el Reglamento y la Carta Circular los abogados Amadeo y Pérez Marchand verbalmente solicitaron permiso primero del Ayudante del Alcaide y del Alcaide después y les fué denegado a menos que se ajustaran a las disposiciones del Regla-

mento. En verdad el Reglamento en relación con estos particulares dispone lo siguiente:

"3. *Visita de un solo abogado:* En caso de que un acusado hubiera encomendado su defensa a más de un abogado, sólo podrá visitarle en ocasión de cada visita uno de los abogados del consejo de defensa.

"4. Otros requisitos: . . .

"(c) El abogado deberá notificar por escrito al Alcaide de la institución por lo menos 24 horas antes de la entrevista su intención de llevar a cabo la misma y los fines para los cuales la solicita."

En relación con estas cuestiones, la declaración incontrovertida del Alcaide fué al efecto de que el edificio donde se halla instalada la Cárcel de Distrito de San Juan fué construído hace más de un siglo y tiene cabida para acomodar normalmente 450 confinados solamente; que una semana antes de la vista de este recurso había allí más de 900 reclusos y el día de la vista el número de confinados era de 632. El edificio no reune las condiciones requeridas para el buen funcionamiento de un moderno penal. Así vemos que sólo tiene un local destinado a celebrar conferencias entre abogados y reclusos, el cual mide 18 pies de largo por 10 de ancho. Y si consideramos lo que a manera de exposición de motivos consignó el Procurador General, al principio del Reglamento, [3] no parece irrazonable exigir a los abogados que notifiquen al Alcaide con 24 horas de antelación su intención de conferenciar con un recluso. De ese modo pueden ha-

_____

[3] "POR CUANTO, con motivo de los últimos sucesos acaecidos en Puerto Rico ha habido un aumento inusitado en el número de reclusos en las instituciones penales;

"POR CUANTO, el número de reclusos excede en muchos casos la capacidad de las instituciones penales, creando serias dificultades que afectan a su funcionamiento y a la disciplina de las mismas;

"POR CUANTO, la planta física de las instituciones penales no ofrece adecuadas facilidades para la entrevista de más de un confinado a la vez sin riesgo para la disciplina del penal y para la seguridad de los confinados;

"POR CUANTO, toda persona encarcelada tiene derecho, de acuerdo con nuestra Carta Orgánica y la Constitución de los Estados Unidos de Amé-

cerse los arreglos convenientes para que no se encuentren a la misma hora en el pequeño local destinado a conferencias dos o más abogados de distintos confinados, sobre todo teniendo presente que después de promulgado el Reglamento y la Carta Circular y radicado este recurso el Alcaide recibió instrucciones verbales del Procurador General que le permitían no exigir el cumplimiento de este requisito cuando las circunstancias lo permitieran.

En lo que respecta a la limitación del número de abogados que puedan conferenciar con un recluso, opinamos que bajo las circunstancias de este caso es irrazonable. Esto es así porque un solo confinado ocupará el local de conferencias en determinado tiempo, a menos que haya varios reclusos que por tener una defensa común tengan los mismos abogados. Atendida esta circunstancia y teniendo en cuenta el objeto perseguido por la reglamentación, es decir, la disciplina del penal y la seguridad pública, no hay justificación para impedir que dos abogados como en este caso puedan conferenciar con su cliente.

Si bien es verdad que de acuerdo con las instrucciones verbales el Alcaide permitiría que más de un abogado conferenciase con un recluso en una ocasión, esto sin embargo, contrario a lo que sucede en cuanto a la disposición referente al número de visitas, no alteraría la irrazonabilidad de la reglamentación pues en éstas, el Alcaide permitiría más de una visita a la semana cuando las circunstancias y facilidades lo hicieran posible, mientras que en lo que respecta al

rica, a proveerse de abogado y a preparar su defensa del delito por el cual se encuentra encarcelada;

"POR CUANTO, bajo las circunstancias antes descritas, las visitas de abogados a los penales no podrán llevarse a cabo en la forma usual, sino que, para la seguridad personal de los abogados y reclusos, y la disciplina de la institución, las mismas deberán ser reglamentadas en tal forma que coexistan la una con la otra sin menoscabo para ninguna de ellas;

"POR TANTO, en virtud de las facultades que me concede la ley, por la presente promulgo la siguiente reglamentación para las entrevistas de abogados y confinados en las diferentes instituciones penales de Puerto Rico: ... "

número de abogados las circunstancias y facilidades no entran en juego, pues, como hemos visto, no se celebrará más de una entrevista a la vez en la sala de conferencias, y el hecho de que hubiera dos abogados no podría afectar la seguridad del penal.

 Otros párrafos del Reglamento establecen:

"2. Días de visita: El abogado podrá ver a un confinado una vez por semana, a menos que justifique a juicio del Alcaide, la necesidad de ver a su cliente más de una vez a la semana.
".
"5. La visita será única y exclusivamente entre el abogado y el confinado, no debiendo estar presente ninguna otra persona, a no ser el guardia penal encargado de la custodia del salón de visitas."

Dado el número de confinados en la referida cárcel, la regla sobre limitación de visitas una vez por semana, según fué modificada por las instrucciones verbales del Procurador General, (⁴) no resulta irrazonable, pues podría darse el caso de que varios abogados de distintos reclusos quisieran conferenciar con ellos el mismo día, y sería imposible acceder a las peticiones de todos, ya que debe darse una oportunidad para que cada confinado pueda conferenciar con su abogado.

 No podemos convenir en que la presencia de un guardia penal a una distancia que le impida oír la conversación entre el abogado y el cliente perjudique los derechos sustanciales de un detenido. A este efecto no debemos perder de vista lo declarado por el Alcaide de que el guardia penal se sitúa a tal distancia que no puede oír lo que hablen el abogado y el preso, y con mayor razón, si éstos a su vez tienen la precaución de no hablar en un tono de voz tan alto que su conversación pueda ser oída.

 Por último, réstanos considerar si el Reglamento, según fué enmendado por la Circular al efecto de que el

(⁴) Como podrá verse del texto de la opinión, hemos considerado como parte del Reglamento las instrucciones verbales dadas por el Procurador al efecto de que cuando las circunstancias lo permitieran el Alcaide concediera una visita en cualquier momento.

mismo se aplicará única y exclusivamente a las visitas que se hagan a los acusados de los recientes actos de terrorismo, atentados, etc., promovidos por la jefatura del Partido Nacionalista, establece una clasificación arbitraria y en consecuencia los priva de la igual protección de las leyes.

A los efectos del caso que nos ocupa, la cuestión a resolver en relación con este punto es si puede legalmente establecerse distinción para fines de seguridad entre personas detenidas por actividades subversivas y aquellos otros detenidos a quienes se imputan delitos de otra naturaleza.

Ya hemos apuntado que durante la semana del 30 de octubre hubo en Puerto Rico una revuelta de la cual hemos tomado conocimiento judicial al discutir la existencia de causa probable. También aparece de la Circular que estableció esta clasificación que: "La reglamentación promulgada el 16 de noviembre en curso se aplicará única y exclusivamente a las visitas que abogados nacionalistas o comunistas hagan *a los acusados de los recientes actos de terrorismo, atentados, etc.,* promovidos por la jefatura del Partido Nacionalista de Puerto Rico y a otros abogados que visiten a dichos acusados." (Subrayado nuestro.)

Considerado el mal que la Reglamentación se propone evitar y la naturaleza del delito imputado a los detenidos por su alegada participación en los actos de terrorismo, atentados, etc., antes referidos, no parece irrazonable establecer una clasificación en cuanto a medidas de seguridad entre una y otra clase de confinados. Podría argüirse que no habiendo sido ellos convictos todavía, deben presumirse inocentes y no imponérseles una reglamentación más onerosa que a los detenidos por otros delitos quienes también se presumen inocentes. Pero como ya hemos indicado, las medidas establecidas por la reglamentación van dirigidas a lograr la disciplina del penal y la seguridad de los confinados, habida cuenta de los actos de rebelión y terrorismo antes mencionados. En consecuencia, la clasificación no resulta caprichosa

ni arbitraria estando, como está, basada en la experiencia que se ha tenido en fecha tan reciente.

Y en lo que concierne a la presunción de inocencia, ninguna relación tiene con las medidas de precaución que deben tomarse en toda institución penal para evitar que los detenidos puedan escaparse o poner en peligro la disciplina de la institución o la seguridad y bienestar de los demás confinados. Tales medidas en forma alguna prejuzgan la culpabilidad de los detenidos.

*Procede por lo expuesto ordenar al Alcaide de la Cárcel de Distrito de San Juan que permita a los abogados Santos P. Amadeo y R. Pérez Marchand conjuntamente conferenciar con el detenido, previo cumplimiento de las demás disposiciones del Reglamento, según éstas han sido interpretadas en esta opinión. En cuanto a los demás extremos, se desestima la petición de hábeas corpus.*