AGUSTÍN CRUZ VÉLEZ, demandante y apelado, *v.* LIVERPOOL AND LONDON & GLOBE INSURANCE COMPANY, demandada y apelante. ABRAHAM DE JESÚS, demandante y apelado, *v.* THE GREAT AMERICAN INSURANCE COMPANY, demandada y apelante.

Número 11360.

*Sometido:* 3 de abril de 1956. *Resuelto:* 23 de noviembre de 1956.

*R. Rivera Zayas, G. Rivera Cestero* y *Milton F. Rua,* abogados de las apelantes; *Romany & Romany,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del Tribunal.

Por envolver idénticas cuestiones de hecho y de derecho, los casos del epígrafe fueron vistos conjuntamente tanto en

el tribunal inferior como en el nuestro. En ambos casos se adujo abundante prueba testifical y documental y en ambos el tribunal a quo dictó sentencia contra las demandadas. Apelaron éstas para ante nos y señalan tres errores, que a su juicio fueron cometidos por dicho tribunal. En nuestra opinión sólo es necesario discutir el primero.(¹) El mismo es al efecto de que dicho tribunal erró "al resolver que los relevos o descargos firmados por los demandantes, mediante los cuales transigieron sus reclamaciones con las demandadas no eran válidos." Antes de entrar a discutirlo veamos las conclusiones de hechos probados, pertinentes a la cuestión envuelta, que figuran en la opinión emitida por dicho tribunal en apoyo de su sentencia:

"1. Que las demandadas Great American Insurance Company y Liverpool and London & Globe Insurance Company; son dos corporaciones extranjeras debidamente autorizadas para hacer negocios de seguros en Puerto Rico, y ambas realizan sus negocios a través de sus agentes generales Compañía Carrión, Inc.

"2. Que el demandante Abraham de Jesús, en octubre 30, 1950, era dueño de un edificio usado para tienda cafetín en Jayuya, y el cual estaba asegurado contra el riesgo de incendio, con un límite de responsabilidad hasta $10,000, bajo una póliza expedida por la corporación demandada The Great American Insurance Co. a favor del demandante Abraham de Jesús, cubriendo la pérdida que pudiera sufrir por razón de incendio tanto el edificio asegurado como las mercancías y el equipo existente en el mismo proveyendo dicha póliza un límite de responsabilidad hasta $6,000 por pérdida en cuanto al edificio,

---

(¹) Los otros dos errores señalados son:

"SEGUNDO ERROR: El tribunal inferior cometió error al resolver que las pérdidas alegadamente sufridas por los demandantes no estaban excluídas de los respectivos contratos de seguro existentes entre los demandantes y las demandadas.

"TERCER ERROR: El tribunal inferior cometió error al resolver que Agustín Cruz Vélez había sufrido una pérdida total que montaba a una suma mayor de Cuatro Mil Dólares ($4,000), y que Abraham de Jesús había sufrido una pérdida parcial con motivo del incendio en el edificio, mercancía y equipo asegurados en la cantidad total de Tres Mil Dólares ($3,000)."

un límite hasta $1,500 por pérdida en la mercancía, y un límite hasta $2,500 por pérdida en el equipo.

"3. Que el demandante Agustín Cruz Vélez, en octubre 30, 1950, era dueño de una tienda de mercancías secas en Jayuya, Puerto Rico, la cual estaba asegurada contra el riesgo de incendio por un límite de responsabilidad hasta $4,000, bajo una póliza expedida por la corporación demandada Liverpool and London & Globe Insurance Company a favor del demandante Agustín Cruz Vélez, cubriendo la pérdida que pudiera sufrir por razón de incendio de las mercancías secas existentes en la referida tienda.

"4. Que en octubre 30, 1950, unos cuantos individuos se amotinaron e hicieron disparos contra el cuartel de la policía de Jayuya y contra los policías allí detacados, pegaron fuego al edificio del cuartel, más tarde a la alcaldía, y el fuego se comunicó a los establecimientos comerciales de los demandantes, destruyendo las mercancías secas aseguradas de Agustín Cruz Vélez, y parcialmente el edificio, mercancía y equipo asegurado perteneciente a Abraham de Jesús.

"5. Que una vez realizados estos hechos los culpables del incendio, como a las cinco de la tarde de ese día, se retiraron a las afueras del pueblo de Jayuya y lo dejaron abandonado.

"6. Que las dos pólizas de seguro expedidas en estos casos contenían una cláusula que copiada a la letra decía como sigue:

" 'Esta compañía no será responsable de pérdida por incendio u otros riesgos asegurados bajo esta póliza causada, directa o indirectamente, por : (a) ataque por fuerzas armadas enemigas, incluyendo la acción tomada por fuerzas armadas militares, navales o aéreas al resistir un ataque enemigo real o inminente; (b) invasión; (c) insurrección; (d) rebelión; (e) revolución; (f) guerra civil; (g) usurpación de poder; (h) una orden de cualquiera autoridad civil, con excepción de actos de destrucción al tiempo de y para prevenir la propagación de un incendio, siempre que dicho incendio no haya sido originado por cualesquiera de los riesgos excluídos en esta póliza'.

" . . . . . . . .

"8. Que después de ocurrido el incendio en estos casos, los demandantes Agustín Cruz Vélez y Abraham de Jesús presentaron respectivamente sus reclamaciones a las corporaciones aseguradoras, demandadas en estos casos, y estas compañías enviaron a su representante Benjamín Acosta, para examinar

las propiedades destruídas; que el referido Benjamín Acosta era un ajustador de seguros con amplia experiencia en la materia y en las leyes de seguros, y por el contrario los demandantes Agustín Cruz Vélez y Abraham de Jesús eran personas completamente legas en esta clase de asuntos e ignorantes por completo de las leyes de seguros; y la corte llega a la conclusión que el ajustador de las compañías de seguros, el referido Benjamín Acosta, valiéndose de sus conocimientos superiores sobre los demandantes Agustín Cruz Vélez y Abraham de Jesús, les hizo creer que lo ocurrido en Jayuya había sido un incendio perpetrado con motivo de una insurrección o revolución y que por tanto las compañías aseguradoras no eran responsables por las pérdidas ocurridas con motivo de tal incendio, y que los demandantes no tenían derecho a reclamación legal alguna contra las corporaciones demandadas, con motivo del referido incendio.

"9. Que los demandantes Abraham de Jesús y Agustín Cruz Vélez creyeron las manifestaciones del Sr. Benjamín Acosta, ajustador de seguros de las compañías demandadas.

"Que el Sr. Benjamín Acosta como representante y como ajustador de las compañías de seguros demandadas, preparó un documento para ser firmado por Abraham de Jesús, que copiado a la letra dice como sigue:

" 'RENUNCIA VOLUNTARIA MEDIANTE PAGO EX-GRATIA—Yo Abraham de Jesús mayor de edad, asegurado bajo la(s) pólizas(s) No.(s) 46609 de la Great American Insurance Company por la presente retiro toda reclamación que tenga o pudiera tener bajo dicho(s) contrato(s) de seguros y renuncio voluntariamente a entablar acción judicial o legal contra dicha Great American Insurance Company como resultado de los daños sufridos por la propiedad descrita en dichas(s) póliza(s) a consecuencia de la insurrección o revolución Nacionalista de los meses de octubre y noviembre de 1950.

" 'Renuncio voluntariamente a mi(s) reclamacion(es) bajo esta(s) póliza(s) por haber aceptado la suma de $250 de la Great American Insurance Company como pago ex-gratia.

" 'La Great American Insurance Company me ha informado que no hay responsabilidad alguna bajo el (los) contrato(s) de seguros mencionado(s) y yo acepto tal decisión como definitiva, retirando para siempre mi(s) reclamación(es) y renunciando el derecho a entablar acción judicial o legal

contra dicha Great American Insurance Company por los daños sufrido(s) en la(s) propiedad(es) asegurada(s) bajo la(s) póliza(s) ya mencionada(s).

" 'Para que conste firmo y juro la presente en Jayuya, P. R. a los 1 días de febrero de 1951.

" 'fdo. Abraham de Jesús

"' 'Aff. No. 3740

" 'Jurado y firmado ante mí por Abraham de Jesús quien doy fe de conocer personalmente hoy día 1 del mes de febrero de 1951 en Jayuya, P. R.

" 'fdo. Celso Dávila
" 'Juez de Paz'

"10. Que el Sr. Abraham de Jesús debido a las manifestaciones de Benjamín Acosta y creídas por él, firmó el referido documento bajo la creencia errónea de que no tenía derecho a reclamar absolutamente nada a la compañía aseguradora por el incendio que le había destruído sus propiedades aseguradas en Jayuya.

"11. Que el Sr. Benjamín Acosta exigió al demandante Abraham de Jesús que suscribiera y jurara el anterior documento ante un notario o ante un funcionario público autorizado para tomar juramento como condición previa para hacer el pago de $250 que se especificaba en dicho documento.

"12. Que la compañía demandada la Great American Insurance Company recibió el referido documento firmado y jurado ante el Juez de Paz de Jayuya, y una vez recibido y aceptado por la demandada Great American Insurance Company, remitió al demandante Abraham de Jesús la referida cantidad de $250."

Sobre el caso de Agustín Cruz Vélez, el tribunal sentenciador llega a conclusiones de hechos similares, copia literalmente la renuncia suscrita por él y hace constar que Cruz Vélez recibió de su aseguradora un cheque por la suma de $2,000. Entonces termina así sus conclusiones de hechos probados:

"17. La Corte llega a la conclusión de que el demandante Agustín Cruz Vélez sufrió una pérdida total que monta a una suma mayor de $4,000, y que el demandante Abraham de Jesús

sufrió una pérdida parcial con motivo del incendio en el edificio, mercancía y equipo asegurados, en la cantidad total de $3,000."

En la opinión del tribunal a quo también figuran las siguientes conclusiones de dereecho:

"No hubo en este caso rebelión ni insurrección dentro del significado que estas frases tienen en una póliza de seguros.

". . . para fortalecer sus conclusiones de derecho toma lo siguiente de las instrucciones al jurado dictadas por el Hon. Clemente Ruiz Nazario, Juez de Distrito de los Estados Unidos para Puerto Rico, en el caso civil seguido por Vicente Dávila contra The Home Insurance Co. of New York et al,. . ."(²) [Aquí copia extensamente esas instrucciones.]

"6. La corte resuelve como cuestión de derecho que los alegados 'releases' presentados como defensa por las compañías demandadas, son nulos, sin ningún valor ni efecto, porque aquéllos fueron obtenidos por medio de las manifestaciones falsas que se les hizo a los asegurados de que no tenían derecho a recibir indemnización alguna por virtud de sus pólizas, porque el fuego había sido causado por una insurrección o rebelión. Ya hemos demostrado por nuestras conclusiones anteriores que no hubo insurrección o rebelión en este caso, sino simplemente un motín. Incendios ocasionados con motivo de un motín eran riesgos expresamente cubiertos por las pólizas y las compañías por tanto son responsables de las pérdidas ocasionadas.

"7. La corte llega a la conclusión de derecho que de no haber sido por las manifestaciones de las compañías de seguros, al efecto de que los demandantes no tenían derecho a reclamación alguna porque los incendios fueron ocasionados por una insurrección o rebelión, los demandantes no hubieran firmado los tales *releases* ni hubieran aceptado de las compañías una cantidad mucho menor de las pérdidas por ellos sufridas.

---

(²) La opinión y sentencia del tribunal a quo están fechadas el 7 de enero de 1954. El caso de *Dávila* v. *Home Insurance Co. of New York* a que se refirió el tribunal de instancia en su opinión, fué revocado y devuelto para ulteriores procedimientos por el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito, con fecha 12 de mayo de 1954. Véase *Home Ins. Co. of New York* v. *Dávila*, 212 F.2d 731.

"8. La corte llega a la conclusión de que hubo una influencia indebida, al hacer estas manifestaciones, por parte del representante ·de las compañías aseguradoras, quien tomó ventaja de los asegurados debido a sus conocimientos superiores sobre las leyes de seguros y la ignorancia de los demandantes sobre estas materias.

"9. La corte resuelve que en casos de esta índole, entre una compañía aseguradora y un asegurado, en que la compañía aseguradora ocupa necesariamente un nivel superior al asegurado, por sus conocimientos superiores sobre seguros y las leyes que los regulan, una falsa representación de la ley por la compañía aseguradora o por sus agentes, que es creída por los asegurados y debido a su creencia errónea inducida por la compañía aseguradora, transigen su reclamación por una cantidad menor de la que es legítimamente debida por la compañía aseguradora, tal transacción es nula en derecho y no constituye una defensa contra la reclamación de los asegurados.

"10. ... importa poco que las manifestaciones o representaciones sobre cuestiones legales fueran hechas de buena fe por las compañías aseguradoras o por sus agentes. Basta con que ellas fueran hechas, fueran falsas o erróneas, creídas por los asegurados y que estos últimos aceptaran una cantidad menor que la debida, y ello debido a la falsa representación hecha."

También indica el tribunal a quo en sus conclusiones de derecho que:

"Para sostener nuestra conclusión de que en esta clase de casos no importa que las falsas representaciones de derecho fueran hechas de buena fe o inocentemente, bastando con que fueran hechas y creídas por los asegurados, vamos a citar el caso de *Camerlin* v. *The New York Central Railroad Co.*, decidido por la Corte de Circuito de Apelaciones para el Primer Circuito ... en noviembre 12, 1952." (3)

Fundado en las anteriores conclusiones de hecho y de derecho el tribunal de instancia condenó a la Liverpool &

(3) El caso de *Camerlin* v. *The New York Central Railroad Co.*, 199 F.2d 698, fué citado y claramente distinguido del de *Dávila* v. *Home Ins. Co. of New York*, supra, que es similar a los de autos, por el propio Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito. Véase *Home Ins. Co. of New York* v. *Dávila*, 212 F.2d 731, 742.

London & Globe Insurance Company a pagar a Agustín Cruz Vélez la suma de $2,000, más las costas y $200 para honorarios; y a la Great American Insurance Company a pagar a Abraham de Jesús $2,750, más las costas y $250 para honorarios.

 Pasamos ahora a discutir el error arriba reseñado. Los arts. 1709, 1715 y 1716 del Código Civil, ed. 1930,—31 L.P.R.A. secs. 4821, 4827 y 4828—disponen:

"Artículo 1709.—La transacción es un contrato por el cual las partes, dando, prometiendo o reteniendo, cada una alguna cosa, evitan la provocación de un pleito o ponen término al que había comenzado.

"Artículo 1715.—La transacción tiene para las partes la autoridad de la cosa juzgada; ...

"Artículo 1716.—La transacción en que intervenga error, dolo, violencia o falsedad de documentos, está sujeta a lo dispuesto en el artículo 1217 de este código."

También disponen los arts. 1213, 1217, 1221 y 1222 del mismo código—31 L.P.R.A. secs. 3391, 3404, 3408 y 3409— que:

"Artículo 1213.—No hay contrato sino cuando concurren los requisitos siguientes:

"1. Consentimiento de los contratantes.

"2. Objeto cierto que sea materia del contrato.

"3. Causa de la obligación que se establezca.

"Artículo 1217.—Será nulo el consentimiento prestado por error, violencia, intimidación o dolo.

"Artículo 1221.—Hay dolo cuando con palabras o maquinaciones insidiosas de parte de uno de los contratantes, es inducido el otro a celebrar un contrato que sin ellas no hubiera hecho.

"Artículo 1222.—Para que el dolo produzca la nulidad de los contratos, deberá ser grave y no haber sido empleado por las dos partes contratantes."

Es innegable que los demandantes en este caso celebraron sendas transacciones con las demandadas respecto a las reclamaciones que creían tener, o que tenían, contra ellas. Es

menester determinar, por tanto, si esas transacciones fueron o no válidas. Si medió error, dolo, violencia o falsedad de documentos, entonces dichas transacciones fueron nulas por falta de consentimiento, requisito esencial para la validez de todo contrato. Art. 1213 del Código Civil, supra. No nos detendremos a analizar si hubo error, violencia o falsedad de documentos, ya que las partes admiten que no los hubo. Réstanos, en su consecuencia, determinar solamente si medió dolo en las transacciones efectuadas. En nuestra opinión no lo hubo. "El dolo tiene un alcance muy amplio e incluye 'el engaño, el fraude, la falsa representación, la indebida influencia ...'" *Cruz* v. *Autoridad de Fuentes Fluviales*, 76 D.P.R. 312, 319–320. Véase también *Rivera* v. *Sucn. Díaz*, 70 D.P.R. 181, 185.

Examinemos a grandes rasgos y en lo pertinente el testimonio de los propios demandantes:

*Agustín Cruz Vélez* declaró que llegó hasta quinto grado, cuando tenía 18 años de edad; después trabajó como peón en la Central Jayuya por espacio de 3 años; luego como dependiente de mercancías secas en el establecimiento de Armando Viñas; más tarde con Zoraido Rivera, también de dependiente en una tienda de mercancías; cuando dejó a Zoraido vino a San Juan a trabajar con R. Ruiz & Cía., igualmente de dependiente. Con esta última estuvo como un año y regresó entonces a Jayuya. Después estableció un negocio propio de mercancías secas. Acosta le dijo "que no tenía ningún derecho a cobrar la póliza" y "que firmara unos papeles que él llevó, para darme una regalía." "Llamó al señor, al otro, y le dijo lo mismo delante de mí. Que nosotros no teníamos ningún derecho a cobrar la póliza porque era contra rebelión. Le dieron $2,000." Tenía 48 ó 49 años de edad y fué Presidente de la Asociación de Padres y Maestros de Jayuya. No recuerda si Benjamín Acosta le habló de insurrección, aunque si recuerda que le habló de rebelión. En 15 de noviembre de 1950 firmó el primer documento y la re-

nuncia la suscribió en 29 de enero de 1951. Durante ese tiempo no habló con ningún abogado ni con ningún ajustador de seguros.

*Abraham de Jesús* manifestó que toda su vida la ha vivido en los barrios y en el pueblo de Jayuya. Fué poco a la escuela, de primero a segundo grado nada más. Lo pusieron cuando tenía 8 años y se salió cuando tenía 10. A los 15 años empezó a trabajar en la Central Santa Bárbara, recogiendo rabos para los bueyes. Estuvo dos años en ese trabajo. A los 17 estableció un negocio de verduras; lo tuvo 2 ó 3 años y luego lo cambió por uno de arroz y habichuelas. Después puso un colmado y un cafetín, el cual tiene desde hace 18 años. A los dos o tres días después del fuego se presentó por allí Benjamín Acosta. Éste no le dijo que no tenía derecho a cobrar; entonces él estaba enfermo. El que lo visitó fué Ramón Alfonzo y le indicó que no había derecho a cobrar; que si ellos querían la compañía les daría una regalía; que todo el mundo había firmado, que por qué él no firmaba. El aceptó $250 porque todo el mundo firmó. "Yo lo acepté porque él dijo que no tenía derecho a cobrar nada."

Los demandantes también pusieron a declarar a *Benjamín Acosta* y *Ramón Alfonzo Reyes*. El primero declaró que tiene 16 años de experiencia como ajustador. Se trasladó a Jayuya 5 ó 6 días o tal vez una semana después del 30 de octubre de 1950. Vió a Agustín Cruz Vélez. "Le indiqué que mi opinión como ajustador independiente era que las compañías de seguros no eran responsables bajo sus pólizas contra incendio, debido a que estos incendios se produjeron a consecuencia de una rebelión o insurrección o usurpación de poder ... y que no teniendo ellos esas pólizas, endosos para cobrar esa clase de pérdida, era a mi juicio que las compañías envueltas no habían aceptado responsabilidad." Le manifestó, además, que antes de proseguir con la investigación, cada asegurado tenía que firmarle un con-

venio que en inglés se llama "Non-Waiver Agreement," con el único fin de que ambas partes preservaran sus derechos y que no fuera a interpretarse alguna acción de su parte como que las compañías estaban aceptando responsabilidad. Cruz Vélez lo llevó donde todos los demás asegurados, entre ellos, Abraham de Jesús. Le explicó a de Jesús y a todos que él podía o no podía aceptar eso y recurrir a los tribunales si deseaba. En ningún momento ofreció transigir en ese primer viaje.

*Ramón Alfonzo Reyes* testificó que Benjamín Acosta envío las renuncias directamente a los asegurados; que le leyó el documento a Abraham de Jesús y le indicó que debía jurarlo ante el Juez de Paz. (⁴)

Bajo las circunstancias, no creemos que hubiera dolo, falsas representaciones o maquinaciones insidiosas de parte de las aseguradoras. (⁵) De los hechos ocurridos en Puerto Rico el 30 de octubre de 1950 ya hemos tomado conocimiento judicial. Fueron calificados por nosotros de "revuelta." *Guadalupe* v. *Bravo, Alcaide,* 71 D.P.R. 975, 988. Es innecesario que resolvamos ahora si tales sucesos constituyeron una insurrección o rebelión. Lo que sí es importante determinar de momento es si las aseguradoras honradamente y de buena fe creyeron que tales sucesos constituían una insurrección o rebelión. Tal determinación no es fácil, y repetimos que no es necesario hacerla al presente, toda vez que aquí concluímos que las renuncias o relevos suscritos por los demandantes fueron enteramente válidos. Veamos cómo se expresa el Tribunal de Apelaciones de los Estados Unidos para el Primer Circuito en el caso de *Home Ins. Co. of New*

---

(⁴) Surge de los autos que Abraham de Jesús firmó la "Renuncia Voluntaria Mediante Pago Ex-gratia" ante el Juez de Paz de Jayuya el primero de febrero de 1951, y que Agustín Cruz Vélez firmó un documento similar el 29 de enero del mismo año, ante un notario, en la ciudad de San Juan.

(⁵) Las conclusiones de derecho del tribunal sentenciador no nos obligan. *Cruz* v. *Autoridad de Fuentes Fluviales,* 76 D.P.R. 312, 317.

*York* v. *Dávila*, 212 F.2d 731, que envolvía cuestiones de hechos y de derecho idénticas a las que están ahora ante nuestra consideración:

"Después de ocurridos los incendios en 30 de octubre de 1950, las aseguradoras emplearon al señor Benjamín Acosta, de Santurce, Puerto Rico, ajustador de seguros independiente, para que a nombre de ellas se ocupara de las varias reclamaciones de Jayuya y les recomendara la acción a ser tomada en cada caso específico. El demandante describió a Acosta como un 'amigo', mas de los autos surge que ellos solamente se habían visto dos o tres veces antes, en relación con el ajuste por Acosta de una reclamación que el demandante hizo en un caso anterior de incendio. Acosta fué a Jayuya el 9 de noviembre de 1950. Se puso a la voz con Dávila y le manifestó, muy acertadamente, que antes de proceder a investigar las pérdidas por incendio sufridas por éste, era necesario que el demandante firmara un llamado convenio de no responsabilidad al efecto de que la investigación que hacía el agente de seguros sobre las supuestas pérdidas por incendio no debía ser interpretada como una renuncia por las compañías de cualesquiera defensas que ellas pudieran tener bajo las cláusulas de las pólizas. Luego de consultar con un abogado, el demandante firmó el convenio de no responsabilidad. Entonces Acosta y el demandante trataron de llegar a un entendido sobre el monto de las pérdidas por incendio sufridas por éste. Una vez acordado el importe de los daños sufridos por el demandante, Acosta le manifestó que de momento no podía prometerle nada; que su opinión personal era que a tenor de la cláusula de las pólizas que excluía responsabilidad por pérdidas causadas por insurrección o rebelión, las aseguradoras no eran legalmente responsables por las pérdidas en cuestión. Indicó al demandante, sin embargo, que recomendaría a las compañías que le pagaran el 50% de las pérdidas sufridas, sobre una base *ex-gratia*, sin aceptar responsabilidad bajo las pólizas.

"Más tarde las aseguradoras instruyeron a Acosta que siguiera adelante y ofreciera transacciones al demandante y a los demás reclamantes sobre la base recomendada por el agente de seguros. De conformidad con esas instrucciones, Acosta preparó en su oficina, allá para mediados del mes de enero de 1951, los documentos de renuncia (*release*) que debían ser utilizados para materializar tales transacciones. Copiamos los

términos de una renuncia típica; todas estaban redactadas sustancialmente en la misma forma: [Aquí se copia la renuncia suscrita por el asegurado Vicente Dávila, la cual es *mutatis mutandis* idéntica a las suscritas por los demandantes Cruz Vélez y de Jesús.] Poco después el demandante visitó la oficina de Acosta para inquirir sobre el estado de las negociaciones y allí se le informó lo que las compañías estaban dispuestas a hacer. Acosta le entregó las renuncias para que las firmara. El demandante se las llevó consigo, sin firmar, y las guardó por espacio de dos semanas. Declaró que durante ese lapso de tiempo el demandante no se aconsejó con ningún abogado respecto a si debía firmar las renuncias; y nada hay en los autos que demuestre que así lo hiciera. Es claro, sin embargo, que el agente de seguros no trató de disuadir al demandante de que buscara consejo legal, el que ciertamente el demandante tuvo amplia oportunidad de obtener, y el que, conforme hemos visto, éste obtuvo antes de suscribir el convenio de no responsabilidad. No existía ninguna relación fiduciaria entre el agente de seguros y el demandante, y debe concluirse que la transacción se efectuó poniendo las cartas sobre la mesa. Aunque el demandante era persona de instrucción limitada, él era un comerciante de experiencia y progresista en Jayuya, dueño de cuantiosos bienes.

"El demandante declaró que jamás leyó las cláusulas de sus pólizas de seguros. Pero el agente de seguros no le hizo maquinaciones insidiosas de clase alguna sobre el contenido de las cláusulas de éstas. Tampoco le falseó en forma alguna los hechos ocurridos en Puerto Rico el 30 de octubre de 1950, que pudieron o no equivaler a una insurrección o rebelión dentro del alcance de la cláusula de la póliza que excluía ciertos riesgos. Esos sucesos eran en realidad públicos y notorios, tan bien conocidos por el demandante como por Acosta. Ya hemos indicado que el 18 de diciembre de 1950 el Tribunal Supremo de Puerto Rico tomó conocimiento judicial de esos sucesos al describir el levantamiento del 30 de octubre como una 'revuelta'. *Guadalupe* v. *Bravo, Alcaide,* 71 D.P.R. 975, 988.

"Dada la naturaleza de las cosas, uno no sabría con certeza si este levantamiento constituyó una insurrección o rebelión dentro del alcance de las pólizas de seguros, hasta que los tribunales resolvieran la cuestión en el curso de algún litigio. Cuanto Acosta podía hacer era expresar una opinión, tal vez una opinión fundada por razón de su experiencia en el campo

de seguros, respecto a lo que los tribunales resolverían o debían resolver en relación con el asunto. Y si él expresó su opinión sincera, no hizo falsa representación de índole alguna, ya fuere de hecho o de derecho.

"Dos semanas más tarde Dávila volvió a la oficina de Acosta con las renuncias sin haberlas suscrito aún. Allí se le informó que no podría obtener de las compañías los pagos ofrecidos, equivalentes al 50% de las pérdidas, hasta que firmara las renuncias.(⁶) Acto seguido el demandante llevó éstas a un notario público y las suscribió formalmente. Entonces se le hicieron pagos por el monto total de $12,000 de conformidad con las transacciones.

"Bajo las circunstancias reseñadas, las aseguradoras o su representante, muy bien pudieron creer honradamente, y no sin fundamento alguno, que ellas tenían una buena defensa legal contra las reclamaciones, bajo la cláusula que les eximía de responsabilidad por ciertos riesgos. Por tanto, ¿no era el caso uno apropiado para ser transigido, evitándose así los inconvenientes de un litigio, a base de algo que no fuera el pago de las pérdidas en su totalidad? Y, ¿cómo podía el agente de seguros explicar la oferta de las aseguradoras de transigir por la mitad de los daños sufridos, a no ser expresando el criterio de éstas de que las pérdidas por incendio específicamente su-

---

(⁶) De la transcripción de evidencia que figura en autos aparece lo siguiente, declarado por el testigo Benjamín Acosta, en respuesta a preguntas héchasle por uno de los abogados de las aseguradoras:

"P. ¿Testigo, tenga la bondad de decirle al señor juez si antes de esa ocasión, usted había tenido alguna relación de clase alguna con Agustín Cruz Vélez o Abraham de Jesús?

"R. No los conocía.

"P. ¿No sabía quiénes eran?

"R. No señor.

"P. ¿Qué le contestaron ellos, si le contestaron algo, a esa manifestación suya?

"R. Que yo hiciera gestiones con las compañías, con las compañías para ver si ofrecían algo en transacción. Y entonces yo le dije que yo le iba a recomendar a las compañías que a base como yo había tasado los daños que transigieran las dos reclamaciones a base del 50 por ciento de esa tasación y en el caso de de Jesús para que él cobrara los $200 o $250 completos le informé a la compañía que los daños eran más o menos $500.

"P. ¿Qué le manifestaron estos señores con respecto a la conformidad de ellos?

"R. Ambos me dijeron que le escribiera a la compañía."

fridas no estaban cubiertas por las cláusulas de la póliza? Sin embargo, según la teoría del demandante, tal cual su letrado la expuso durante el juicio, el agente de seguros 'no debió decir una sola palabra sobre responsabilidad'; que si al tratar con el demandante e inducir a éste a llegar a una transacción, el agente manifestó, no importa cuán inocentemente ni cuán de buena fe, que las aseguradoras no eran legalmente responsables, y resultaba que el agente estaba equivocado en este aspecto legal, ello constituía tal maquinación insidiosa y dolosa que invalidaba la transacción y la renuncia obtenida por un agente de seguros que presumiblemente conocía mejor la ley de seguros que el asegurado, que era un ignorante en tal campo y quien, según la versión del demandante, aceptó ciegamente la aseveración del agente de que la aseguradora no era responsable, sin obtener ayuda legal de clase alguna, cosa que tuvo amplia oportunidad de hacer. [Discute entonces el Tribunal de Apelaciones el alcance de su opinión en el caso de *Camerlin* v. *New York Central R. Co.*, 1 Cir., 1952, 199 F.2d 698, y continúa manifestando:]

"En otras palabras, en el caso de *Camerlin* aplicamos la que creímos era la regla federal en un caso en el cual estaba envuelta la ley sobre responsabilidad del patrono. (*Employer's Liability Act*), y en el que el ferrocarril celebró una transacción directamente con un empleado suyo, de poca instrucción, que confió en las aseveraciones héchasle. El caso de autos presenta una situación enteramente distinta, y la regla a ser aplicada es una de ley local puertorriqueña. No nos ha sido posible hallar ninguna decisión del Tribunal Supremo de Puerto Rico que sugiera que un convenio de transacción y renuncia puede, bajo las leyes de Puerto Rico, 'ser dejado sin efecto por motivos tan sutiles como los aducidos por el demandante en el presente caso. Sería lamentable que ésa fuera la ley, y no creemos que lo sea." (Corchetes nuestros.)

Toda vez que ésta es una cuestión local, no estamos obligados a seguir lo antes expuesto. Sin embargo, consideramos que ello es una exposición correcta de nuestra ley. Al igual que en el de *Dávila*, opinamos que si bajo las circunstancias envueltas en los casos del epígrafe las aseguradoras o su representante creyeron de buena fe que ellas tenían una buena defensa legal contra las reclamaciones de los deman-

dantes, a tenor de la cláusula que les eximía de responsabilidad en casos de insurrección o rebelión, los de autos eran casos apropiados para ser transigidos, evitándose así las molestias de un litigio.

No estamos seguros de si al expresarse en la forma en que lo hizo en la oración final de la extensa cita que de la opinión del Tribunal del Primer Circuito hemos hecho más arriba, dicho tribunal tenía conocimiento de nuestra opinión en el caso de *Cruz* v. *Autoridad de Fuentes Fluviales*, 76 D.P.R. 312. La opinión en el caso nuestro fué emitida el 13 de abril de 1954 y la del Tribunal de Circuito en el caso de *Dávila*, supra, lo fué el 12 de mayo del mismo año. Mas sea ello como fuere, el caso de *Cruz* v. *Autoridad de Fuentes Fluviales* es claramente distinguible tanto del de *Dávila* como de los aquí envueltos. En el de *Cruz* v. *Autoridad de Fuentes Fluviales* (copiando del sumario) "Una campesina ignorante, sencilla, fué visitada por un ajustador de seguros a los seis días de haberse causado la muerte de su hija de seis años de edad por un automóvil en un caso de responsabilidad admitida por el demandado debido a su negligencia, y confiando en la manifestación del ajustador de que la corte no le concedería más de $1,000 porque la persona fallecida era una menor y no el jefe de familia—manifestación que él sabía era falsa y fué hecha con la intención de que la señora confiara, como confió, en ella—aceptó la oferta del ajustador y firmó una carta de pago." En el de *Dávila*, conforme dice la Corte de Circuito, se trataba de "un comerciante de experiencia y progresista . . . dueño de cuantiosos bienes." En los casos de autos se trata, conforme hemos visto, de hombres avezados en la lucha por la vida, que si bien no tuvieron gran preparación académica, tenían por lo menos larga experiencia en los negocios. Además, en el caso de *Cruz* el relevo fué firmado el mismo día que el ajustador visitó a la demandante, cuando ésta aún se hallaba agobiada por la pérdida que acababa de sufrir. En los de autos los

relevos o renuncias fueron firmados alrededor de tres meses después de ocurridos los sucesos del 30 de octubre, más de dos meses y medio después de la primera visita del ajustador, y luego de los demandantes haber tenido amplia oportunidad de pensar sobre el paso que iban a dar. Compárese *Agosto* v. *Porto Rican Express Co.*, 47 D.P.R. 897. No nos es posible, por ende, concluir que las renuncias suscritas por los demandantes carezcan de validez. Las acciones por ellos instadas no pueden, en su consecuencia, prosperar.

*Deben revocarse las sentencias apeladas y declararse sin lugar las demandas.*