CITIBANK, N.A., demandante y recurrido, *v.* DEPENDABLE INSURANCE COMPANY, INC., demandada y peticionaria.

Número: CE-87-155 Resuelto: 27 de mayo de 1988

504

*María Emilia Picó,* de *Rexach & Picó*, abogada de la peticionaria; *Néstor Durán,* de *McConnell, Valdés, Kelly, Sifre, Griggs & Ruiz Suria,* abogado del recurrido.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

El 2 de noviembre de 1984 Dependable Insurance Company, Inc. (en adelante Dependable), expidió a favor de Citibank, N.A. (en adelante Citibank), una póliza maestra de seguro denominada *Single Interest Automobile Physical Damage Insurance* (en adelante la Póliza) para asegurar o

proteger el interés del banco en los automóviles que financiaba. Posteriormente, Dependable notificó a Citibank que había decidido cancelar la Póliza, efectiva el 31 de octubre de 1985. Citibank exigió la devolución de las primas de seguro cobradas pero no devengadas (*unearned premiums*). Así las cosas, Dependable envió a Citibank un cheque por la cantidad de $2,673,806.47 por concepto de cancelación de póliza. En carta de 27 de noviembre de 1985, AIB & Associates, agente de seguros de Dependable en Puerto Rico, informó a Citibank que este pago correspondía al 75% de la cantidad que se adeudaba y que el balance sería remitido más tarde. El 29 de noviembre de 1985 Citibank reclamó a Dependable $874,602.16 como balance adeudado. En respuesta, Dependable requirió a AIB & Associates que pagara a Citibank lo reclamado. Según Dependable, esta cantidad correspondía a las comisiones pagadas a AIB & Associates.

Dependable, además, negó cubierta en todas aquellas reclamaciones donde Citibank reposeyó la unidad después de 31 de octubre de 1985, fecha de efectividad de la cancelación de la Póliza. Alegó que la pérdida asegurada (*loss*) ocurría cuando Citibank reposeía el vehículo, no cuando éste sufría el accidente o daño. A su vez, Citibank sometió a Dependable reclamaciones por concepto de pérdidas ocurridas bajo la Póliza. Las reclamaciones se referían tanto a la póliza maestra de interés sencillo (*single interest*), como a la denominada de interés compuesto (*double interest*).[1]

Por no estar las partes de acuerdo sobre las cuantías correspondientes a las diferentes partidas que componían la deuda de Dependable, Citibank instó demanda donde reclamaba: (1) en la primera causa de acción, la devolución de las

---

[1] La póliza de interés sencillo (*single interest*) protegía al banco de la pérdida del interés en los vehículos financiados que eran reposeídos o entregados voluntariamente por el comprador condicional. Bajo la póliza de interés compuesto (*double interest*) estaba protegido no sólo el interés de la entidad financiera, sino también el del comprador condicional.

primas no devengadas por la cantidad de $874,602.16, más intereses por temeridad; (2) en la segunda causa de acción, todas las reclamaciones de pérdidas con más de noventa (90) días de sometidas a Dependable y no satisfechas; (3) en la tercera causa de acción, las reclamaciones que Dependable había denegado a Citibank por falta de cubierta, y (4) en la cuarta causa de acción, daños y perjuicios por incumplimiento de contrato.

El 18 de septiembre de 1986 Citibank solicitó sentencia sumaria parcial en relación con la primera y tercera causas de acción. Luego de celebrar la correspondiente vista, el tribunal de instancia resolvió que los daños reclamados en la tercera causa de acción estaban cubiertos por la Póliza, pero sólo faltaba su estimación. En cuanto a la primera causa de acción, las primas no devengadas, el tribunal determinó que había controversia en cuanto a la cuantía a ser devuelta. Denegó la sentencia sumaria parcial y ordenó a las partes suministrarse información y tratar de encontrar una solución extrajudicial.

A tales efectos, las partes, con sus respectivos abogados, se reunieron. En relación con la primera causa de acción, Dependable ofreció pagar $889,053 a Citibank para satisfacer la deuda por primas pagadas y no devengadas. Con posterioridad, las partes celebraron una segunda reunión, esta vez sin que estuvieran presentes sus respectivos representántes legales. Aunque hay controversia en relación con las causas de acción que allí se discutieron, las partes están de acuerdo en que Dependable acordó pagarle a Citibank la suma de $1,080,000. Para implantar este acuerdo, la abogada de Dependable envió al abogado de Citibank un borrador de la "estipulación de transacción". Éste lo examinó e hizo algunas revisiones. El 26 de enero de 1987 las partes, representadas por sus respectivos abogados, suscribieron una estipulación de transacción que lee como sigue:

Comparecen las partes representadas por sus respectivos abogados que suscriben y respetuosamente someten a la consideración de este Honorable Tribunal para su *aprobación* la siguiente estipulación:

1. Las partes han acordado transigir entre sí *las reclamaciones objeto de este pleito* mediante el pago por la parte demandada, Dependable Insurance Company, Inc., a la parte demandante, Citibank, N.A., de la suma de $1,080,000.00.

2. *En consideración al pago de $1,080,000.00, Citibank desiste con perjuicio de la Primera, Tercera y Cuarta Causas de Acción de la demanda,* así como de cualquier reclamación por prima no devengada, daño o pérdida de cualquier naturaleza bajo la póliza maestra de seguro número VSI-23505 ("Single Interest Automobile Physical Damage Insurance", en adelante la "Póliza").

3. *En cuanto a la Segunda Causa de Acción, Citibank desiste sin perjuicio de las reclamaciones bajo las pólizas de interés compuesto* ("double interest"). Respecto a las reclamaciones bajo la Póliza, el desistimiento sigue siendo con perjuicio.

4. *Las partes se relevan mutuamente de cualquier reclamación que ahora o en el futuro puedan tener bajo la Póliza. Es la intención de las partes transigir toda reclamación que haya surgido, o pueda surgir bajo la Póliza.*

POR TODO LO CUAL, ambas partes solicitan y suplican de este Honorable Tribunal que imparta su *aprobación a esta estipulación y proceda a dictar sentencia de conformidad*: a) ordenando a Dependable a pagar a Citibank la suma de $1,080,000.00, sin especial imposición de costas ni honorarios de abogados; b) ordenando el archivo con perjuicio de todas las reclamaciones bajo la Póliza; y c) ordenando el desistimiento sin perjuicio de todas las reclamaciones bajo pólizas de interés compuesto ("double interest"). (Énfasis suplido.) Apéndice, págs. 20–21.

Dos (2) días más tarde, Dependable remitió a Citibank un cheque por la cantidad de $1,080,000. Cabe señalar, que posteriormente este cheque fue endosado por la representación legal del banco y cobrado por Citibank. El 2 de febrero de

1987 las partes presentaron al tribunal la estipulación de transacción. El 9 de febrero de 1987 Citibank presentó una moción titulada *Moción aclaratoria y/o impugnación de transacción*, donde alegó que nunca tuvo la intención de desistir con perjuicio de las *reclamaciones por pérdidas* que tuvieran más de noventa (90) días de sometidas comprendidas en la segunda causa de acción montantes a $262,508.29. También reclamó que medió "grave error o dolo en la premisa o base de la transacción extrajudicial" que se acordó entre el Sr. Miguel A. Alcocer, vicepresidente del Citibank, y el Sr. Douglas Patterson, representante de Dependable. Según Citibank, este error motivó que creyera que las reclamaciones estaban "completamente pagadas o en proceso de pagarse". Apéndice, pág. 24. Acompañó la moción con una declaración jurada del señor Alcocer. En lo pertinente esta declaración lee:

5. Ahora bien, en ningún momento se mencionó, discutió o negoció las reclamaciones bajo la Póliza que Citibank le había sometido a Dependable y que tenían más de 90 días de sometidas. Estas son las reclamaciones que Dependable supuestamente había pagado en su totalidad o que estaba procesando para pago. Estas reclamaciones en ningún momento formaron parte, directa o indirectamente, del acuerdo de transacción. No formaron parte porque Citibank entendía, en base a las representaciones de Dependable, de que algunas de ellas ya estaban pagadas y otras en vía de pago. Por tal motivo nunca pasó por la mente de Citibank considerar estas reclamaciones en la transacción. Para Citibank este pago ya estaba aprobado y era cuestión de recibir el mismo.

6. Dependable alega ahora que la transaccción acordada incluye *todas* las reclamaciones bajo la Póliza, incluyendo las reclamaciones con más de 90 días de sometidas. Eso *no* fue el acuerdo y Dependable lo sabe o debiera saberlo. Citibank aún no ha recibido el pago *total* de esas reclamaciones.

7. Si ese hubiese sido el caso, Citibank jamás hubiere transigido por la referida suma de $1,080,000.00. De modo alguno Citibank hubiese acordado transigir *todas* sus reclamaciones

bajo la Póliza por esa suma de dinero. Realmente es inconcebible que Dependable pretenda atribuirle esa intención a Citibank en este caso. (Énfasis suplido.) Apéndice, pág. 32.

La peticionaria se opuso oportunamente a las pretensiones de Citibank y solicitó se reconociera la finalidad del contrato de transacción y procediera al archivo, con perjuicio, del pleito según acordado por las partes.

Así las cosas, el 26 de febrero de 1987 el tribunal dictó una resolución que ordenaba a las partes "reunirse nuevamente para agotar la posibilidad de una *nueva transacción* . . .". (Énfasis suplido.) Apéndice, pág. 14. Indicó, además, que no iba a "dedicar tiempo a examinar lo negociado en la transacción, [que era] suficiente lidiar con el pleito principal". Íd. Luego de una serie de trámites procesales el tribunal emitió otra resolución donde reiteraba que no iba a "examinar nada relacionado con la transacción". Íd., pág. 15.

No conforme con las resoluciones del tribunal de instancia, Dependable presentó recurso de *certiorari* ante este Foro. Solicitó que se dejaran sin efecto las mismas y en su lugar decretara que la estipulación de transacción incluía todas las reclamaciones. Decidimos revisar y expedimos el auto.

## I

### *El contrato de transacción*

El Art. 1709 del Código Civil, 31 L.P.R.A. sec. 4821, señala que "[l]a transacción es un contrato por el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen término al que había comenzado". Moxó Ruano lo define como uno "consensual, sinalagmático, con causa subjetivada, de eficacia determinativa o declarativa, por el que las partes actualizan su poder dispositivo para, mediante mutuas renuncias y libera-

ciones, y a veces prestaciones complementarias, decidir una controversia jurídica litigable".([2]) A. Moxó Ruano, *Notas sobre la naturaleza de la transacción*, 34 Rev. Der. Priv. 673 (1950).

■■■ Anteriormente y al examinar la figura de la transacción hemos dicho que ésta "requiere una cuestión anterior que le dé vida, ya sea judicial o extrajudicial", *A. Martínez & Co. v. Long Const. Co.*, 101 D.P.R. 830, 834 (1973); que "supone que las partes tienen dudas sobre la validez o corrección jurídica de las respectivas pretensiones que dan lugar a la controversia y que han optado por resolver haciéndose mutuas concesiones luego de un proceso de negociación", *Sucn. Román v. Shelga Corp.*, 111 D.P.R. 782, 791 (1981); que "[e]s pura cuando versa únicamente sobre los derechos controvertidos", y que tendrá carácter novatorio cuando "por voluntad de las partes el negocio transaccional elimina, *sustituye o modifica* —y no sólo fija— la anterior relación incierta". (Énfasis en el original.) *García v. The Commonwealth Ins. Co.*, 118 D.P.R. 380, 389, 390 (1987).([3])

■■■ Albaladejo identifica tres (3) elementos o requisitos esenciales del contrato de transacción. *Primero*, ha de

---

([2]) Véase en general sobre el contrato de transacción, J.P. Fontanella, *Ámbito de la Transacción*, 57 Rev. Jur. Cataluña 581 (1958).

([3]) Castán Tobeñas nos dice que la finalidad de la transacción es *"dar certidumbre* a una relación jurídica incierta en el momento en que se conviene la transacción, y al recaer el acuerdo de las partes sobre ello constituye la causa". (Énfasis suplido.) J. Castán Tobeñas, *Derecho civil español común y foral*, Madrid, Ed. Reus, 1981, T. V, pág. 775.

Ogáyar Ayllón a su vez señala que "los tratadistas ponen de relieve que la transacción está destinada a eliminar un pleito o la incertidumbre de las partes sobre una relación jurídica, que recae, no sobre cosas dudosas, en el sentido que tiene esta calificación, sino sobre una cosa dudosa por los diferentes criterios de las partes sobre ella, consecuencia de haberse hecho litigiosa entre aquellas, se haya o no planteado el litigio". M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, T. XXII, Vol. 2, 1979, pág. 11.

existir *una relación jurídica incierta*, o sea "pretensiones contrarias, motivadas por una incertidumbre jurídica, bien porque el posible derecho de las partes sea incierto o dudoso objetivamente, o porque aquéllas estiman que a su juicio hay incertidumbre aunque en realidad no la haya". *Segundo*, ha de haber *la intención de eliminar la incertidumbre*. La intención de las partes ha de ser la de sustituir "la relación dudosa por una que sea para ellas cierta e incontestable". *Por último*, tienen que hacerse *concesiones recíprocas*; este es el elemento que le da el cáracter de contrato bilateral a la transacción. El fin transaccional "sólo se consigue sacrificando las partes sus pretensiones en la controversia, *pero nada obliga a que esas concesiones recíprocas sean perfectamente equivalentes.* . . . Estos sacrificios pueden ser de orden moral o tener contenido económico y han de ser recíprocos porque en otro caso existiría una mera renuncia". (Énfasis suplido.)[4]

■ Al aplicar las anteriores normas de derecho al caso de autos encontramos que estamos frente a una transacción pura con carácter novatorio en donde se dan los tres (3) requisitos enumerados por Albaladejo. Veamos. Citibank negoció el contrato de transacción con Dependable después que el juez de instancia resolvió que procedían la primera y tercera causa de acción; aún quedaban pendientes la segunda y cuarta causas de acción y la estimación de las cuantías de las causas de acción ya resueltas. No cabe duda de que las partes tuvieron la "intención de eliminar la incertidumbre" de su relación jurídica, el lenguaje que utilizaron fue claro y preciso. Nadie obligó a Citibank a firmar el contrato de transacción. Su abogado lo examinó y revisó, y si lo firmó fue porque entendió que la estipulación de transacción ponía fin a la incertidumbre que existía en cuanto a las partidas y a las

---

[4] Albaladejo, *op. cit.*, pág. 17.

cantidades involucradas. El contrato de transacción es uno que versa únicamente sobre los derechos en controversia, donde hubo concesiones recíprocas que sustituyeron la relación incierta anterior. Dependable accedió a pagar una suma de dinero y Citibank, a su vez, a desistir de las reclamaciones en contra de Dependable. Estas concesiones recíprocas no son ni tienen que ser equivalentes.

## II

*Alcance del contrato de transacción; renuncia de derechos*

■ Pasemos ahora a analizar el alcance de la transacción y la renuncia de derechos. El Art. 1714 del Código Civil, 31 L.P.R.A. sec. 4826, dispone que la transacción "no comprende sino los objetos expresados determinadamente en ella, o que, por una inducción necesaria de sus palabras, deban reputarse comprendidos en la misma . . . [y que la] renuncia general de derechos se entiende sólo de los que tienen relación con la disputa sobre que ha recaído la transacción".

■ En el caso de *Sucn. Román v. Shelga Corp.*, supra, pág. 788, señalamos —cuando citamos a Scaevola— "'que la ley quiso llevar a sus extremos la regla *interpretativa de restricción* en las transacciones, limitándola rigurosamente a los objetos expresamente determinados, o que por una *inducción necesaria* de sus palabras deban reputarse incluídos . . . [éstas deben ser interpretadas] . . . limitadamente, aunque sin descuidar lo de la reciprocidad como norma interpretativa'". (Énfasis suplido y en el original.) Recientemente, en *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61, 74–75 (1987), expresamos:

Por su naturaleza, el contrato de transacción debe interpretarse de forma restrictiva. En lo que no sean incompatibles con las normas que regulan los contratos de transacción, son de aplicación las reglas generales sobre la interpretación de

contratos. Ahora bien, en relación con la interpretación de los contratos, Díez-Picazo nos dice que éstos "deben interpretarse de acuerdo con la buena fe . . . [que es] un [*standard*] de conducta arreglada a los imperativos éticos exigibles de acuerdo con la conciencia social imperante . . . . *Los contratos han de ser interpretados presuponiendo una lealtad y una corrección en su misma elaboración, es decir, entendiendo que las partes al redactarlos quisieron expresarse según el modo normal propio de gentes honestas y no buscando circunloquios, confusiones deliberadas u oscuridades . . . . El contrato debe ser interpretado de manera que el sentido que se le atribuya sea el más conforme para llegar a un desenvolvimiento leal de las relaciones contractuales y para llegar a las consecuencias contractuales exigidas conforme a las normas éticas.* La buena fe impone también la aplicación de las ideas de confianza y autorresponsabilidad en la interpretación . . . . *Las declaraciones de voluntad deben interpretarse en el sentido más conforme con la confianza que hayan podido suscitar de acuerdo con la buena fe*". (Énfasis suplido.) L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, Cap. XI, Sec. 45, págs. 251–252. (Escolios omitidos, énfasis suplido y en el original.)

Al aplicar el enfoque aquí reseñado al presente caso encontramos que el contrato de transacción fue redactado en términos claros y precisos. En el mismo se expresó literalmente que las partes habían "acordado transigir entre sí las reclamaciones de este pleito" y que era su intención "transigir *toda reclamación* que haya surgido o pueda surgir bajo la Póliza". (Énfasis suplido.) Apéndice, pág. 68. En cuanto a la segunda causa de acción, fueron aún más específicos; desistieron sin perjuicio de las reclamaciones bajo las pólizas de interés compuesto y con perjuicio "de las reclamaciones bajo la Póliza". No podemos estar de acuerdo con la interpretación que del contrato hace Citibank, de que la intención de las partes no fue el desistir con perjuicio en cuanto a todas las reclamaciones bajo la Póliza planteadas en la segunda causa de acción.

## III

*El contrato de transacción y la cosa juzgada*

El Art. 1715 del Código Civil, 31 L.P.R.A. sec. 4827, señala que "[l]a transacción tiene para las partes la autoridad de la cosa juzgada; pero no procederá la vía de apremio sino tratándose del cumplimiento de la transacción judicial". Esto significa que las partes tienen que considerar los puntos discutidos como definitivamente resueltos; no pueden volver nuevamente sobre los mismos. De no ser así "'perdería la transacción su razón de ser y existir'". (Énfasis suprimido.) *Canino v. Bellaflores*, 78 D.P.R. 778, 780 (1955). La validez de la transacción no depende de que ésta se hubiera hecho de acuerdo a derecho; si esto fuera así, la transacción sería "un acto inútil y que a nadie aprovecha . . .". *Matienzo v. González et al.*, 26 D.P.R. 457, 474 (1918).

En *Canino v. Bellaflores*, supra, citamos con aprobación lo siguiente de Puig Peña: "[p]reviendo el supuesto del incumplimiento discutió la doctrina sobre si los efectos propios de la transacción habían de ser los naturales de los contratos (como contrato que es), o, por el contrario, debía dotarse al convenio de una posición especial injertando en el mismo una propia sustancia judicial en orden a la declaración de "cosa juzgada" y al procedimiento para la ejecución de sentencia". (Énfasis suprimido.)[5] Sobre el particular Albaladejo nos dice que "la transacción extrajudicial no está amparada por la vía de apremio y no puede llevarse a cumplimiento sin que se haya declarado su eficacia en el juicio correspondiente . . . *pero sí tiene autoridad de cosa juzgada, lo que . . . 'ha de entenderse e interpretarse en el sentido de que una vez acordada la transacción, no será lí-*

---

[5] F. Puig Peña, *Tratado de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1951, T. IV, Vol. II, pág. 525.

*cito exhumar pactos o cláusulas, vicios o defectos, posiciones o circunstancias afectantes a las relaciones jurídicas . . .* '". (Énfasis suplido.)(6) Gullón Ballesteros llega a la misma conclusión y añade que "[l]a cosa juzgada de la transacción [a diferencia de la cosa juzgada producida por la sentencia] . . . quiere decir que *el juez viene obligado a tener en cuenta la decisión de las partes y a no contradecirla, aunque la crea injusta*". (Énfasis suplido.)(7)

No obstante, la doctrina expresada anteriormente "no opera para impedir que el juzgador interprete [la] extensión y aplicación [del contrato de transacción] al pleito judicial en el que se levanta como defensa". *Sucn. Román v. Shelga Corp.*, supra, pág. 787. Gullón Ballesteros señala que "esta cosa juzgada no impide que el juez valore la validez del propio contrato de transacción, y que estime su falta de causa, que ha sido otorgado con dolo, etc., o sea, que el juez puede revisar el juicio lógico o el acto mismo que ha cuajado en una transacción".(8)

La controversia en el caso de autos finalizó cuando las partes suscribieron el contrato de transacción. La actuación del juez de instancia al ordenar a las partes reunirse nuevamente para agotar la posibilidad de "una nueva transacción" equivale al acto ilícito de exhumar pactos o cláusulas en el contrato de transacción judicial de que nos habla Albaladejo. Erró el tribunal al rehusar darle finalidad, efecto de cosa juzgada, al proceso ya culminado.(9)

---

(6) Albaladejo, *op. cit.*, pág. 55. También, véase L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 3ra ed., Madrid, Ed. Tecnos, 1982, Vol. II, pág. 545.

(7) A. Gullón Ballesteros, *La Transacción*, en *Tratado práctico y crítico de Derecho civil*, Madrid, Ed. Inst. Nac. Est. Jur., 1964, T. XLIII, Vol. 2, pág. 139.

(8) Gullón Ballesteros, *op. cit.*, págs. 139–140.

(9) El contrato de transacción en el caso de autos también comprende el desistimiento de la acción judicial. La Regla 39.1(a) de Procedimiento Civil, 32

# IV

*El contrato de transacción—el error y dolo*

 Pasemos ahora a considerar si mediaron algunas de las circunstancias que permiten a las partes impugnar un contrato de transacción. El Art. 1716 del Código Civil, 31 L.P.R.A. sec. 4828, dispone que "[l]a transacción en que intervenga error, dolo, violencia o falsedad de documentos está sujeta a lo dispuesto en [el Art. 1217]",(10) el cual señala que "[s]erá nulo el consentimiento prestado por error, violencia, intimidación o dolo".

 Albaladejo analiza el Art. 1.268 del Código Civil español, de donde proviene nuestro Art. 1716, *supra*, y señala que "[a]plicado a la transacción, no presenta el dolo ninguna especialidad, por lo que se regula por las normas

---

L.P.R.A. Ap. III, establece el mecanismo procesal para el desistimiento de un caso por estipulación de las partes:

"(a) *Por el demandante; por estipulación.* Sujeto a las disposiciones de la Regla 20.5, un demandante podrá desistir de un pleito *sin orden del tribunal*, (1) mediante la presentación de un aviso de desistimiento en cualquier fecha antes de la notificación por la parte adversa de la contestación o de una moción solicitando sentencia sumaria, cualesquiera de éstas que se notifique primero, o (2) *mediante la presentación de una estipulación de desistimiento firmada por todas las partes que hayan comparecido en el pleito".* (Énfasis suplido.)

El desistimiento por estipulación de las partes no necesita orden judicial, es automático. 9 *Wright Miller & Cooper, Federal Practice and Procedure* Sec. 2366 (1971) comenta sobre la Regla 41(a)(1) federal, de donde proviene la Regla 39.1(a) nuestra, de la forma siguiente:

"*The court has no power to impose terms and conditions if a plaintiff properly dismisses* by notice under Rule 41(a)(1). Nor may the plaintiff seek to make a conditional dismissal under that portion of the rule. If dismissal is by stipulation under Rule 41(a)(1), the parties work out for themselves the conditions on which they will enter into the stipulation. Accordingly, the authority of the court to require 'such terms and conditions as the court deems proper' is limited to a motion for dismissal under Rule 41(a)(2)." (Énfasis suplido y escolios omitidos.)

También, véanse: 5 *Moore's Federal Practice* Sec. 41.02, págs. 41-21, 41-22 (1979); *Gardiner v. A.H. Robins Co., Inc.*, 747 F.2d 1180 (8vo Cir. 1984).

(10) 31 L.P.R.A. sec. 3404.

generales de la contratación".(11) El Art. 1221 del Código Civil, 31 L.P.R.A. sec. 3408, dispone que "[h]ay dolo cuando con palabras o maquinaciones insidiosas de parte de uno de los contratantes, es inducido el otro a celebrar un contrato que sin ellas no hubiera hecho". Ahora bien, "[p]ara probar el dolo hay que demostrar la falta intencional o mala fe de la persona a quien se le imputa, ya que la buena fe se presume". *Canales v. Pan American*, 112 D.P.R. 329, 339 (1982). Véase, también, M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1979, T. XII, Vol. 2, pág. 62. "La preparación académica, condición social y económica, y relaciones y tipo de negocios en que se ocupa una persona son factores de particular significación al determinar la existencia de dolo que anule su consentimiento." *Miranda Soto v. Mena Eró*, 109 D.P.R. 473, 478 (1980).

El Art. 1716 del Código Civil, *supra*, termina señalando que "no podrá una de las partes oponer el error de hecho a la otra siempre que ésta se haya apartado por la transacción de un pleito comenzado". Véanse: *Cruz v. Liverpool & London Ins. Co.*, 79 D.P.R. 722, 729 (1956); *Arandes v. Báez*, 20 D.P.R. 388, 391–392 (1914). De entrada debe reconocerse que la "estructura y naturaleza de la transacción obliga a aplicar a ésta con suma cautela la doctrina del error". Albaladejo, *op. cit.*, pág. 64. El error a que este artículo se refiere, "el que constituye vicio del consentimiento, es el de hecho . . . [y] ha *de recaer sobre la sustancia de la cosa objeto del contrato*, y no sobre el derecho que asista a las partes . . .". (Énfasis suplido.) *Arandes v. Báez*, supra, pág. 392.(12) En el caso de autos, no hubo falta intencional o

---

(11) Albaladejo, *op cit.*, pág. 62.
(12) En *Capó Caballero v. Ramos*, 83 D.P.R. 650, 671 (1961), expresamos:

mala fe de parte de Dependable. El contrato se redactó después de varias reuniones entre personas preparadas, conocedoras de la banca y el negocio de seguros, asesoradas por sus respectivos asesores legales. En éstas se discutieron los términos de la transacción y las partes tuvieron acceso a la información sobre la cual versaba. Antes de firmar el contrato de transacción, Citibank tuvo la oportunidad de examinarlo, estudiarlo y revisarlo. Estuvo de acuerdo con el claro lenguaje utilizado. Ahora no puede pretender alegar que no fue su intención decir lo que dijo. Surge claramente del contrato de transacción que las reclamaciones bajo la Póliza que se transigieron incluían todas las de la segunda causa de acción.

Citibank luego de ponderar y considerar sus opciones optó por transigir las reclamaciones del pleito en consideración del pago por Dependable de $1,080,000. Dependable cumplió con su parte del contrato, envió los $1,080,000. Citibank, sin embargo, a pesar de que se aprovechó del cumplimiento de Dependable, al cobrar el cheque no cumplió con su parte del contrato. Ahora y bajo estas circunstancias no puede pretender impugnar el contrato de transacción alegando error o dolo.

---

"De acuerdo con los tratadistas, el error que crea nulidad relativa (anulabilidad del negocio) según el criterio prevaleciente —la inexistencia inclusive, en determinados casos para algunos, —es un error de hecho esencial que constituye, según los textos, una *representación falsa o inexacta de la realidad; creer verdadero lo que es falso, o a la inversa; el conocimiento falso o equivocado de una cosa o de un hecho, por incompleto o inexistente*; el defecto de la correcta representación en la formación de la voluntad, la noción falsa o el concepto equivocado; 'disconformidad o discordancia entre nuestras ideas y la naturaleza de las cosas' . . . . Borell y Soler más conceptuosamente dice que el error de hecho 'es la falta de ecuación entre una cosa y el conocimiento que tenemos de la misma. Puede recaer en la percepción de la misma cosa, en el juicio que nos formamos de ella y en el raciocinio, si el error recae en algunas de las premisas . . . [.] El error de percepción, en este caso, consiste en tomar una cosa por otra; el de juicio, en atribuirle condiciones de que carece o en desconocer las que tiene . . . .'" (Énfasis suplido y escolio omitido.)

■ Albaladejo nos dice que "el ser inoperante el error de hecho cuando una de las partes se ha apartado por la transacción de un pleito comenzado, *al no poder alegarse dicho vicio, es una imposición del principio de la buena fe, la que exige que, en tales casos, prevalezca el instrumento de paz y de concordia que es la transacción, para que no sea estéril el sacrificio de la parte que se apartó del litigio promovido"*. (Énfasis suplido.)[13]

## V

*Conclusión*

Por las razones antes expuestas resolvemos que el contrato de transacción entre Citibank y Dependable fue válido y puso fin al pleito entre ambos. El tribunal de instancia erró al no denegar la impugnación de Citibank y también al no dar por desistida la demanda.

Por los motivos antes expuestos, *se dictará sentencia que revoque las resoluciones recurridas.*

El Juez Presidente Señor Pons Núñez no intervino.

---

[13] Albaladejo, *op cit.*, pág. 67.